ROTHENBERG, J.
Lorillard Tobacco Company (“Loril-lard”) appeals a final judgment entered after a jury verdict in favor of Dorothy Alexander (“Mrs. Alexander” or “the plaintiff’), individually and as Personal Representative of the Estate of Coleman Alexander, in this ¿⅛⅛⅛-progeny case.[1] After a three-week trial, the jury found in favor of Mrs. Alexander on her claims against Lor-illard for strict liability, fraudulent concealment, conspiracy to commit fraud by concealment, and negligence, but found Mrs. Alexander’s husband, Coleman Alexander (“Coleman”), twenty percent comparatively liable, and awarded Mrs. Alexander $20 million in compensatory damages and $25 million in punitive damages.
Lorillard filed multiple post-trial motions, including motions seeking remittitur of the compensatory and punitive damages awards. The trial court denied all of Lor-illard’s post-trial motions except the motion for remittitur of the compensatory damages award and remitted the compensatory damages award to $10 million. After computation of comparative fault, Mrs. Alexander was awarded $8 million in compensatory damages and $25 million in punitive damages, which the trial court declined to remit. This appeal ensued.
On appeal, Lorillard basically reiterates its post-trial claims of error. Additionally, Lorillard now claims that it is entitled to a new trial on compensatory damages rather than the remittitur that it sought and received post-trial. Because we find Loril-lard’s multiple arguments on appeal without merit; the remitted compensatory damages award in the amount of $10 million and the punitive damages award in the amount of $25 million are neither excessive nor unconstitutional; and the compensatory and punitive damages awards are supported by the manifest weight of the evidence, we affirm.
FACTUAL AND PROCEDURAL BACKGROUND
Mrs. Alexander filed suit against Loril-lard based on the death of her husband, Coleman, from smoking-related lung cancer. The complaint included claims against Lorillard for negligence, strict liability, fraudulent concealment, and conspiracy to commit fraud by concealment, and sought compensatory and punitive damages.
During voir dire, the potential jurors were provided a list of names, including that of the plaintiffs daughter, Diane Alexander (“Diane”), and asked if they recognized any of the names. None of the jurors responded. A few days later, however, one of the jurors, Melinda Graham, recognized Diane when she saw her in the courthouse hallway. The plaintiffs counsel immediately advised the trial court of this development. Lorillard sought to have the juror removed and replaced. After interviewing Ms. Graham, the trial *71 court denied Lorillard’s motion to remove her from the jury.
During the trial, Mrs. Alexander testified about Coleman’s smoking history, their lives together, and the final months before Coleman’s death from lung cancer. Mrs. Alexander testified that Coleman began smoking in sixth grade and smoked from one to two packs of cigarettes per day. In addition, Mrs. Alexander, a former nurse, relayed conversations she had with Coleman where she talked to him about the health hazards associated with smoking. Mrs. Alexander explained that although she tried to convince Coleman to stop smoking, up until 1985, Coleman told her that he believed smoking, particularly smoking filtered cigarettes, was safe and that he did not think the tobacco companies would make a product that would kill people. Coleman specifically told Mrs. Alexander that he had switched to Lorillard’s Kent cigarettes in 1958 because he believed they were safer than other brands because of their filter design. Finally, sometime in 1985, when Coleman began to believe that smoking was harmful, he tried to, but was unable to stop smoking, because he was addicted to cigarettes. The plaintiffs addiction expert confirmed that Coleman was addicted to cigarettes.
Mrs. Alexander also spoke of her life with Coleman, both before and after they received his lung cancer diagnosis. The Alexanders, who began dating in high school, had been married almost thirty-eight years and had raised three children when Coleman died at the age of fifty-nine. Mrs. Alexander was Coleman’s nurse and primary caretaker until his painful death in 1995. Mrs. Alexander described how Coleman suffered, and how by the time of his death, he was incontinent and could no longer move or breathe without help. At the time of Coleman’s death, Mrs. Alexander was fifty-seven years old, and although seventy-three at trial, Mrs. Alexander never dated anyone after Coleman’s death.
On the day before the jury was to begin its deliberations, the trial judge informed the parties that he would be attending a funeral during the second afternoon of jury deliberations. The judge explained that he would be available by telephone to answer any questions raised by the jury. Over Lorillard’s objections, the jury proceeded with its deliberations. At 2:03 p.m. on the second day of deliberations, while the judge was away, the jury announced that it had reached a verdict. Seven minutes later, however, at 2:10 p.m., the jury told the bailiff that it needed a few more minutes. Seventeen minutes later, at 2:27 p.m., the jury advised the bailiff that it had reached a verdict. The bailiff notified the trial judge and the judge was in the court to receive the verdict at 8:43 p.m.
The jury found against Lorillard on all claims, but found Coleman twenty percent at fault, and returned a verdict awarding Mrs. Alexander $20 million in compensatory damages and $25 million in punitive damages. Lorillard moved for a new trial on several issues and also moved for remit-titur of the compensatory and punitive damages awards. The trial court denied all motions except for Lorillard’s motion to remit the compensatory damages, which it remitted to $10 million.
DISCUSSION
First, and foremost, this Court is mindful of, and underscores, that abuse of discretion is the appropriate standard of review for all but one of the issues on appeal.[2] Lorillard’s constitutional dial- *72 lenge to the amount of the punitive damages award, however, is subject to de novo review. R.J. Reynolds Tobacco Co. v. Martin, 53 So.3d 1060, 1071 (Fla. 1st DCA 2011) (citing Engle v. Liggett Group, Inc., 945 So.2d 1246, 1263 (Fla.2006)).
We begin, as we must, with the Florida Supreme Court decision in Engle, where the Court held that although the class-action case filed against tobacco companies and tobacco industry organizations by smokers and their survivors could not proceed as a class-action lawsuit on the issues of individual causation and apportionment of damages, certain findings on common liability would stand and would be provided res judicata effect in subsequently filed individual cases. Engle, 945 So.2d at 1254-55. Consequently, once Coleman was established as a member of the Engle class and Lorillard as one of the tobacco industry Engle defendants, the following findings were given preclusive effect in this case: (1) smoking causes certain cancers and medical conditions; (2) nicotine is addictive; (3) Lorillard placed cigarettes on the market that were defective and unreasonably dangerous; (4) Lorillard concealed or omitted material information concerning the health effects and addictive nature of smoking; (5) Lorillard agreed to conceal or omit this information with the intention that the public would detrimentally rely on the information; (6) Lorillard sold or supplied cigarettes that were defective; (7) Lorillard sold or supplied cigarettes that did not conform to the representations of fact made by Lorillard; and (8) Lorillard was negligent. Id. at 1277.
With these findings and the standard of review in mind, we now discuss the issues on appeal.
1. Whether the trial court abused its discretion by denying Lorillard’s motion to strike juror Melinda Graham.
The trial court’s determination of whether to remove a juror for non-disclosure is subject to a three-prong analysis. Tricam Indus. Inc. v. Coba, 100 So.3d 105, 112 (Fla. 3d DCA 2012) (citing Pereda v. Parajon, 957 So.2d 1194, 1197 (Fla. 3d DCA 2007)). Thus, the party seeking a new trial based on allegations that a juror failed to disclose information must demonstrate that: “(1) the information is relevant and material to jury service in the case; (2) the juror concealed the information during questioning; and (3) the failure to disclose the information was not attributable to the complaining party’s lack of diligence.” Tricam, 100 So.3d at 112 (quoting Pereda, 957 So.2d at 1197).
Applying this test, we find that while the information at issue was relevant and the non-disclosure was not the result of Lorillard’s lack of due diligence, the second element — concealment of information during voir dire — is missing. See, e.g., Singletary v. Lewis, 584 So.2d 634, 636 (Fla. 1st DCA 1991) (holding that a juror’s relationship or knowledge of one of the parties is material and the extent and nature of the relationship or knowledge must be determined by interviewing the juror); see also Tricam, 100 So.3d at 112 (clarifying that the “due diligence” test requires *73 that the questions be sufficiently precise to explain the type of information which the potential juror is asked to disclose); Birch v. Albert, 761 So.2d 355, 358 (Fla. 3d DCA 2000) (underscoring that information is considered to be concealed if it is “squarely asked for” and not provided). Because Lorillard failed to establish concealment, the trial court did not abuse its discretion by denying Lorillard’s motion to remove Ms. Graham.
The trial court is in the superior position to make such a finding, and this Court will not disturb the trial court’s credibility determinations. Smiley v. Greyhound Lines, Inc., 704 So.2d 204, 205 (Fla. 5th DCA 1998) (holding that the trial court is in a superior position to weigh the evidence and determine the credibility of the witness because it has the opportunity to observe the witness testify, thus, the appellate court should not substitute its judgment for that of the trial court unless there is a lack of evidence to support the trial court’s findings). In this case, the trial court questioned Ms. Graham, found her to be credible, and made a factual finding that during voir dire, she did not conceal her acquaintance with the plaintiffs daughter. Accordingly, this Court must, and does, defer to the trial court’s credibility finding.
As part of the jury selection process, a list of names, including that of the plaintiffs daughter, Diane, was read to the jurors and they were asked if they recognized any of the names. As Ms. Graham did not recognize Diane Alexander’s name, she did not respond. Although Ms. Graham did not recognize the name “Diane Alexander,” she did recognize Diane when she saw her in the hallway at the courthouse a few days after the trial had started. Ms. Graham recognized Diane as a secretary at the school that Ms. Graham’s children had attended a few years earlier. Mrs. Alexander’s counsel informed the trial court immediately, the trial court conducted an extensive interview of Ms. Graham, including inquiry into the extent of her relationship with Diane and her ability to serve as an impartial juror, and learned that Ms. Graham’s acquaintance with the plaintiffs daughter was both casual and distant. The trial court also considered Ms. Graham’s explanation as to why she did not initially reveal this information to Lorillard’s counsel — she did not recognize the name “Diane Alexander,” and only recognized Diane when she saw her in the hallway of the courthouse after the trial had commenced — and the trial court found Ms. Graham to be credible.
Because the trial court conducted an adequate inquiry and the record supports the trial court’s factual finding that Ms. Graham did not conceal any information during voir dire, we conclude that the trial court did not abuse its discretion when it denied Lorillard’s motion to remove her from the jury.
2. Whether the trial court abused its discretion by denying Lorillard’s post-trial motion to interview Ms. Graham.
The sanctity of the jury process and the privacy of the jurors are paramount to our judicial process and are closely guarded. Rodgers v. After Sch. Programs, Inc., 78 So.3d 42, 45 (citing Schmitz v. S.A.B.T.C. Townhouse Ass’n, 537 So.2d 130, 131 (Fla. 5th DCA 1988)). Thus, juror interviews are highly disfavored and rarely granted. Id. It is an equally well-established principle of our jurisprudence that a party may not stand idly by and allow the proceedings to continue without objection and later complain of error. Rooney v. Hannon, 732 So.2d 408, 411 (Fla. 4th DCA 1999).
*74 Lorillard’s post-trial motion to interview Ms. Graham was based on post-trial research, which Lorillard could, and should, have conducted prior to entry of the verdict. Having already raised the issue of Ms. Graham’s relationship with Diane Alexander when it first challenged Ms. Graham’s ability to serve on the jury during the trial, due diligence at that juncture would have revealed the information Loril-lard claimed to be “newly discovered post-trial.” The information Lorillard obtained post-trial was publicly and easily available, and thus it should have been obtained prior to the entry of the verdict. See Rooney, 732 So.2d at 410 (“As a general rule, if a party obtains knowledge during the progress of the trial of acts of jurors, or acts affecting them, which he shall wish to urge as objections to the verdict, he must object at once, or as soon as the opportunity is presented, or be considered having waived his objection”) (quoting E. Air Lines, Inc. v. J.A. Jones Constr. Co., 223 So.2d 832, 333-34 (Fla. 3d. DCA 1969) (emphasis in original)). Instead, Lorillard waited until it received an unfavorable verdict to do additional research of Ms. Graham. We therefore find the trial court did not abuse its discretion by denying Lorillard’s post-trial motion to interview Ms. Graham.
3. Whether the trial court’s absence during the jury’s deliberation requires a new trial.
Here Lorillard basically objects to the trial court’s absence for seven minutes — between 2:03 p.m., when the jury announced that it had reached a verdict, and 2:10 p.m., when it indicated that it needed more time. According to Loril-lard, had the trial judge been in court at 2:03 p.m., the jury would not have had seven more minutes to deliberate, and, by implication, change its verdict on this three-week trial. This argument is frivolous. The law does not require a judge to be present every minute that the jury deliberates. The only requirement is that the judge be present when there is any communication with the jury and that the judge be available to answer any questions raised by the jury. See generally Harbaugh v. State, 711 So.2d 77, 80-82 (Fla. 4th DCA 1998) (discussing several cases in which the judge’s absence during jury communications was at issue).
4. Whether the trial court abused its discretion by admitting Coleman Alexander’s statements about his smoking.
The trial court’s ruling on evidentiary issues is subject to a review for abuse of discretion. Griffin v. Ellis Aluminum & Screen, Inc., 30 So.3d 714, 717 (Fla. 3d DCA 2010).
The statements complained of by Loril-lard were admitted under the “state of mind” exception to the hearsay rule, section 90.803(3) of the Florida Statutes, (2012):
(3) THEN-EXISTING MENTAL, EMOTIONAL, OR PHYSICAL CONDITION.
(a) A statement of the declarant’s then-existing state of mind, emotion, or physical sensation, including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health, when such evidence is offered to:
1. Prove the declarant’s state of mind, emotion, or physical sensation at that time or at any other time when such state is an issue in the action.
2. Prove or explain acts of subsequent conduct of the declarant.
As a threshold matter, a statement admitted under this exception must relate to a material fact or issue in the case. § 90.803(3)(a)(l); Huggins v. State, 889 *75 So.2d 743, 757 (Fla.2004) (“[A witness’] state of mind is inadmissible unless probative of a material issue.”) (emphasis added). Accordingly, statements of the de-clarant’s then-existing state of mind are admissible to prove or explain the declar-ant’s subsequent conduct or to prove the declarant’s state of mind at the time that the statement was made or at any other time, but only when such a state is an issue in the action.
Lorillard complains of testimony by Mrs. Alexander relaying her conversations with Coleman about his smoking and his responses to her efforts to encourage him to stop smoking because of the health hazards associated with smoking. Mrs. Alexander testified, in part, that when she spoke with Coleman about the health hazards related to smoking in the 1950s and 1960s, Coleman told her that he continued to smoke because: (1) Re did not think that smoking was a problem; (2) he believed Kent cigarettes were safe because of their filters; (3) he believed the tobacco companies’ representations because they knew their products best; and (4) he did not believe that the tobacco companies would make a product “that would kill” anyone.
Those statements are clearly material and relevant to a key issue in this case: Coleman’s detrimental reliance on the marketing and public relations materials produced and distributed by Lorillard and the tobacco industry in general. Similarly, the statements explained why Coleman smoked, why he chose to smoke Lorillard’s product, and why he continued to rely on the information relayed by Lorillard and other members of the tobacco industry. Additionally, Mrs. Alexander’s testimony, that Coleman switched to Kent cigarettes in 1958 and continued to smoke them through 1985 because he believed filtered cigarettes were safe, was relevant to establish Coleman’s reliance outside of the limits of the statute of repose. Since the statute of repose begins in 1982, Coleman’s belief and reliance through 1985 was relevant to show that his cause of action was not barred by the statute of repose.
Contrary to Lorillard’s argument, those statements were not after-the-fact statements of why Coleman smoked in the past, rather they were statements as to why Coleman continued to smoke at that time. Coleman’s subjective beliefs were offered to prove his subsequent conduct and to explain his continued conduct of smoking and his continued reliance on the representations made by Lorillard and the other tobacco companies.
Similar statements have been admitted in other JS'nyZe-progeny cases, and appellate courts have rejected arguments similar to those made by Lorillard as to the admissibility of the statements at issue in this case. See, e.g., Lorillard Tobacco Co. v. Mrozek, 106 So.3d 479, 480 (Fla. 1st DCA 2012) (finding that the trial court did not err in admitting “purported hearsay evidence” showing the plaintiffs state of mind and attitude about smoking decades before her death). We agree with the trial court and conclude that the statements complained of by Lorillard fall within the then-existing state of mind exception to the hearsay rule and were therefore properly admitted into evidence.
5. Whether the trial court abused its discretion by denying Lorillard’s motion for a new trial on the compensatory and punitive damages.
The jury awarded Mrs. Alexander $20 million in compensatory damages and $25 million in punitive damages. Upon Loril-lard’s motion to remit the compensatory damages, the trial court reduced those damages to $10 million. The trial court, however, found that the punitive damages *76 award did not warrant remittitur and allowed that award to remain at the $25 million awarded to Mrs. Alexander by the jury.
DISCUSSION ON DAMAGES

A. Compensatory Damages

Lorillard claims it is entitled to a new trial on the compensatory damages because: (1) Lorillard did not expressly and specifically accept the remittitur; and (2) the trial court determined that the compensatory damages award was excessive and “seemed to be the result of prejudice or passion.”
Pursuant to Florida’s remittitur and ad-ditur statute, section 768.74 of the Florida Statutes, (2012), the trial court has the responsibility to review the amount of an award and determine if it is excessive or inadequate “in light of the facts and circumstances which were presented to the trier of fact.” § 768.74(1). “If the court finds that the amount awarded is excessive or inadequate, it shall order a remittitur or additur, as the case may be.” § 768.74(2). In making its determination, the trial court is guided by the following statutory considerations:
(5) In determining whether an award is excessive or inadequate in light of the facts and circumstances presented to the trier of fact and in determining the amount, if any, that such award exceeds a reasonable range of damages or is inadequate, the court shall consider the following criteria:
(a) Whether the amount awarded is indicative of prejudice, passion, or corruption on the part of the trier of fact;
(b) Whether it appears that the trier of fact ignored the evidence in reaching a verdict or misconceived the merits of the case relating to the amounts of damages recoverable;
(c) Whether the trier of fact took improper elements of damages into account or arrived at the amount of damages by speculation and conjecture;
(d) Whether the amount awarded bears a reasonable relation to the amount of damages proved and the injury suffered; and
(e) Whether the amount awarded is supported by the evidence and is such that it could be adduced in a logical manner by reasonable persons.
§ 768.74(5) (emphasis added).
(1) Lorillard’s waiver
Lorillard’s position that it is entitled to a new trial, not the remittitur it requested and received, because the trial court found that the compensatory damages award of $20 million appeared to be a result of prejudice or passion is not well-taken. To the contrary, a remittitur is the prescribed remedy for a trial court’s finding that an award may be excessive because it is indicative of prejudice, passion, or corruption. § 768.74(5)(a); Glabman v. De La Cruz, 954 So.2d 60, 63 (Fla. 3d DCA 2007) (reversing a jury award, remanding to the trial court with instructions to follow section 768.74, and ordering a remittitur because the verdict on damages was so excessive that it only could have been the result of passion or emotion). The statute expressly provides that upon making such a finding, the trial court must first order a remittitur or additur, and then, only after the party adversely affected by the change in damages does not agree, the trial court must order a new trial on the damages amount. §§ 768.74(2), (4), Fla. Stat. (2012); see also Philon v. Reid, 602 So.2d 648, 651-52 (Fla. 2d DCA 1992) (reversing trial court’s order granting a new trial on damages, remanding for the trial court to enter a remittitur, and describing the process whereby a new trial on damages may only *77 be ordered if, and after, the remittitur is rejected), (abrogation on other grounds recognized, Ketchen v. Dunn, 619 So.2d 1010, 1013 (Fla. 2d DCA 1993)).
Because this Court hopes to discourage future attempts by tobacco industry defendants to present the same meritless argument, we specifically address and distinguish the cases cited by Lorillard to support its claim that it is entitled to a new trial on compensatory damages just because the trial court found the amount awarded by the jury may have been the result of “passion or prejudice.” First, we note that Lorillard’s reliance on Philip Morris USA, Inc. v. Naugle, 103 So.3d 944, 948 (Fla. 4th DCA 2012), is misplaced. Although in Naugle the Fourth District Court of Appeal reversed the trial court’s denial of a motion for a new trial on damages because the Fourth District concluded that remittitur could not cure the harms caused by an award that was “infected by passion and prejudice,” the Fourth District Court of Appeal strictly limited its ruling to the “unique facts” of its case and underscored that the ruling was based on the jury’s complete disregard for the trial court’s instructions. Id. (holding that a “remittitur cannot cure a jury’s disregard for [the trial court’s] instructions”).
Lorillard’s reliance on Lassitter v. Int’l Union of Operating Eng’rs, 349 So.2d 622 (Fla.1976), for that same proposition is equally misplaced. There, the “improper influences of passion and prejudice” included: the publication during the trial of many articles discussing the events leading to the trial and the trial progress with headlines like “Union Harassment Claimed in Trial” and “More Testimony Given On Union Violence;” multiple heated exchanges during the trial, including a union attorney calling one of the witnesses a liar, provoking the trial judge to threaten the attorney with jail; and evidence of union harassment of a union member who testified for Lassitter. Id. at 627. The Lassit-ter Court agreed that “the amount of the damage awards, coupled with these outside influences, was such as to shock judicial conscience [and compel a new trial on damages].” Id. at 627-28 (emphasis added). We do not find either Naugle or Lassitter to be factually analogous to the instant case, and therefore, we are not guided by those decisions.
More importantly, however, we note that Lorillard itself requested a re-mittitur of the damages awards, not a new trial on the grounds the awards were excessive, or that they were the product of inflamed passions. The trial court granted Lorillard’s request for a remittitur and reduced the compensatory award in half, from $20 million to $10 million. And although Lorillard was seeking a greater reduction, it did not object to the amount of the remittitur when it was granted.[3] *78 Because Lorillard requested and received a remittitur and failed to object to the remitted amount or to request a new trial on that ground, we conclude Lorillard is estopped from now arguing that it is entitled to a new trial on damages on this ground. See Grosso v. Fid. Nat’l Title Ins. Co., 983 So.2d 1165, 1172-73 (Fla. 3d DCA 2008) (holding that a party may not make one claim or take one position in a judicial proceeding and then take a contrary or inconsistent position in a subsequent proceeding).
(2) The remitted amount
Compensatory damages are intended to redress or compensate for a concrete loss. R.J. Reynolds Tobacco Co. v. Townsend, 90 So.3d 307, 311 (Fla. 1st DCA 2012). Where the loss is of a non-economic nature, however, such as for mental pain and anguish and for loss of consortium, the valuation is even more difficult. Id. Because no formula can determine the value of such a loss, great deference is given the jury’s estimation of the monetary value of the plaintiffs mental and emotional pain and suffering. Id.
While non-economic damages are inherently difficult to measure, the jury and the trial court, who had the unique opportunity to observe Mrs. Alexander and to hear and consider all the evidence presented during the three-week trial, certainly were in a position to evaluate and determine the intensity and weight of Mrs. Alexander’s loss and to place a monetary value on that loss. In this case, the jury compensated Mrs. Alexander for her mental pain and suffering as she nursed, cared for, and watched the love of her life as he became incontinent and unable to move or breathe. The jury had the opportunity to watch and listen to Mrs. Alexander talk about Coleman, to hear about their lives together and their dreams for the future, and to see her pain and loss as it was reflected in her countenance. Based on its observation, and on the evidence presented at trial, the jury determined that Mrs. Alexander’s mental pain and loss of consortium with her husband of almost thirty-eight years had a value of $20 million. The trial judge, who also was able to observe Mrs. Alexander and review all the evidence presented by both parties, applied the mandates of section 768.74 to remit the compensatory damages award to $10 million.
Similar, or greater, amounts of compensatory damages have been entered against tobacco companies in cases with similar facts. See, e.g., Townsend, 90 So.3d at 307 (upholding an award of $10.8 million for compensatory damages to the widow of a smoker); Philip Morris USA Inc. v. Cohen, 102 So.3d 11, 19 (Fla. 4th DCA 2012) (upholding a $10 million compensatory damages award to smoker’s widow); Philip Morris USA, Inc. v. Kayton, 104 So.3d 1145, 1147 (Fla. 4th DCA 2013) (upholding an $8 million compensatory damages award).
Most notably, the facts in Townsend, affirming a compensatory damages award of $10.8 million to the widow of a smoker, are almost identical to those in the instant case. Mrs. Townsend, like Mrs. Alexander, had married young and was married for thirty-nine years when her husband died from smoking-related lung cancer at fifty-nine years old. Also like Mrs. Alexander, Mrs. Townsend never remarried af *79 ter her husband’s death. After reviewing Mrs. Townsend’s testimony, in which she described her husband’s pain and suffering as she cared for him during the last six months of his life, Florida’s First District Court of Appeal found that the compensatory damages award of $10.8 million was supported by the facts of that case. The court underscored that while the $10.8 million awarded to Mrs. Townsend for compensatory damages might be at the “outer reasonableness” for such a case, it was not beyond reason and, therefore, the appellate court found no abuse of discretion in the trial court’s refusal to second-guess the jury’s award. Townsend, 90 So.3d at 312; see also Cohen, 102 So.3d at 19 (affirming a $10 million compensatory damages award on evidence “nearly identical to the evidence relied upon ... in Townsend ”).
The trial court is in the best position to determine whether the compensatory damages award is excessive. See § 768.74(6) (underscoring the trial court’s discretionary authority to review the damage amounts awarded by the jury in light of the “fundamental precept of American jurisprudence ... that such actions should be disturbed or modified with caution and discretion”). Accordingly, because the evidence presented at trial, which has already been addressed in this opinion, “bears a reasonable relation to the amount of damages proved and the injury suffered,” we conclude the remitted $10 million compensatory damages award was not excessive. Townsend, 90 So.3d at 311 (quoting § 768.74(5)); Cohen, 102 So.3d at 18 (“[A jury] verdict should not be disturbed unless it is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate.”) (quoting Aills v. Boemi, 41 So.3d 1022, 1027-28 (Fla. 2d DCA 2010)).

B. Punitive Damages

Lorillard claims the jury’s $25 million punitive damages award was: (1) tainted by the evidence admitted as to the actions of other tobacco companies; (2) unconstitutionally excessive; and (3) fueled by prejudice or passion based on the excessive compensatory jury award. We disagree with Lorillard, and conclude that the punitive damages award was: (1) based on Lorillard’s own conduct, including its participation as a co-conspirator; (2) neither unconstitutionally nor otherwise excessive; and (3) well-within an acceptable ratio to the compensatory damages award.
(I) The punitive damages award was not improperly based on the actions of other tobacco companies.
Lorillard contends that the punitive damages award was tainted by the plaintiffs reliance on the actions of other tobacco companies. This argument is without merit. The record reveals that the trial court instructed the jury that in determining whether punitive damages were justified, the jury could only consider damages caused by Lorillard’s conduct and could only punish Lorillard for harms it caused. Based on those instructions, the jury found that Lorillard was responsible for Mrs. Alexander’s damages and punished Lorillard for its own conduct.
Lorillard’s argument is also without merit because Mrs. Alexander’s complaint included claims for fraudulent concealment and conspiracy to commit fraud by concealment. Pursuant to Engle, the elements of fraudulent concealment and conspiracy to commit fraudulent concealment were established and are to be given res judicata effect. Engle, 945 So.2d at 1276-77. Accordingly, once Lorillard was identified as an Engle defendant, Lorillard’s participation in the conspiracy with the *80 other Engle defendants was established as a matter of law. Id.
Notably, Engle established that tobacco companies like Lorillard “concealed or omitted material information not otherwise known or available knowing that the material was false or misleading or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes or both.” Id. at 1277. Furthermore, the Engle Court found that the members of the tobacco industry, which includes Lorillard, “agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment.” Id. Accordingly, to prevail on the fraudulent concealment and conspiracy claims, Mrs. Alexander was only required to show that Coleman relied on the deceptive statements made by Lor-illard and the other members of the conspiracy (“other tobacco companies”). See Kayton, 104 So.3d at 1150.
We also note that the law regarding conspiracy is well-settled, and provides that an act done in pursuit of a conspiracy by one conspirator is an act for which each other conspirator is jointly and severally liable. See Nicholson v. Kellin, 481 So.2d 931, 935 (Fla. 5th DCA 1985). “Conspiracy is not a separate or independent tort but is a vehicle for imputing the tortious acts of one coconspirator to another to establish joint and several liability.” Ford v. Rowland, 562 So.2d 731, 735 n. 2 (Fla. 5th DCA 1990) (citing Nicholson, 481 So.2d at 935).
The evidence submitted at trial, which included the deceptive statements made by Lorillard and its co-conspirators upon which Coleman relied to continue smoking Lorillard’s product until 1985, when he first believed that cigarette smoking (even with filters) was harmful, clearly established direct and active participation by Lorillard. For example, as early as 1953, when the tobacco industry became aware of the health concerns associated with use of its products, Lorillard met with other industry leaders in New York and they decided to fight the evidence by embarking on an aggressive public relations campaign rather than admitting that the scientific evidence revealed that smoking cigarettes caused lung cancer. Within weeks of this meeting, the industry published a statement to the public, known as the Frank Statement, denying that smoking was the main cause of lung cancer. Lorillard was a signatory to the Frank Statement, which also falsely claimed that many of the health claims against tobacco had been abandoned due to lack of evidence.
The tobacco industry compounded the damage caused by its misrepresentations when it told the public that the industry would conduct its own scientific research and would warn the public if it was determined that there were cancer-causing agents in cigarettes. To that end, the Tobacco Industry Research Committee and, subsequently, the Tobacco Institute were launched for the specific purpose of creating a controversy about whether smoking was harmful, to interject doubt about the hazards of smoking, and to confuse the public. The evidence at trial showed that Lorillard was involved in the creation of the Tobacco Institute in 1968 and that leading corporate officers of Lor-illard served in leadership roles for these tobacco industry organizations. In that capacity, Lorillard conspired with the other tobacco companies to create doubt and mislead the public.
Lorillard and the Tobacco Institute continued to dispute the claims that cigarettes were addictive and hazardous. In the 1970s, for example, the chairman of the Tobacco Institute said on television that *81 “we do not believe that cigarettes are hazardous.” In 1988, when ABC asked Loril-lard to appear on 20/20, Lorillard referred ABC to the Tobacco Institute, whose representative said “we don’t know” whether cigarette smoking causes cancer. In the 1990s, the head of Lorillard stated that he did not believe that cigarettes caused cancer. In 1994, the head of Lorillard testified under oath before Congress that he did not believe nicotine was addictive. It was not until 2000 that Lorillard first admitted that cigarettes cause lung cancer and are addictive.
The evidence presented at trial further highlighted Lorillard’s duplicity and Coleman’s reliance on Lorillard’s statements. In 1952, for example, when Lorillard introduced its new filtered Kent cigarette, Lor-illard represented to the public that filtered cigarettes reduced the risk to smokers and reassured the public that Kent cigarettes were safe. Mrs. Alexander testified that Coleman took those misrepresentations to heart, and actually chose to smoke Kent cigarettes because he considered them to be safe due to their filters. Mrs. Alexander testified that Coleman relied on these representations at least until 1985, when he first began to believe that cigarettes were harmful and tried to stop smoking, but could not because he was addicted.
Unlike compensatory damages, which are intended to redress a concrete loss, punitive damages, like criminal penalties, are intended to punish past conduct and to deter future behavior. BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 568, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). Based on the foregoing facts and evidence presented at trial, we conclude that the jury’s decision to award punitive damages against Lorillard was supported by ample evidence of Lorillard’s own conduct and, in compliance with the trial court’s instructions to the jury, was based on the harms caused to Coleman by Lorillard — individually and as a co-conspirator with the other tobacco companies.
(2) The $25 million punitive damages award is not unconstitutionally excessive in light of a $10 million remitted compensatory damages award.
Lorillard’s second challenge to the punitive damages amount is that the award is “unconstitutionally excessive.” We disagree with Lorillard, and find that the punitive damages award at issue passes constitutional muster under both the guidelines established by the United States Supreme Court and those established by Florida law.
In contrast to all the other issues raised in this appeal, our review of Lorillard’s constitutional challenge to the amount of the punitive damages award is de novo. Engle, 945 So.2d at 1263; Martin, 53 So.3d at 1071. Importantly, because the punitive damages award falls well within the parameters set forth in section 768.73(l)(a) and (b), which permits an award of punitive damages in amounts of up to three and four times that of compensatory damages, the award is presumed to be constitutionally permissible under Florida law. § 768.73(l)(a), (b)(2); see also Cohen, 102 So.3d at 16 (explaining that while no bright-line rule exists, single-digit ratios are more likely to comport with constitutional due process rights) (citing Engle, 945 So.2d at 1264-65); Martin, 53 So.3d at 1070 (holding that section 768.73 creates a rebuttable presumption that a punitive damages award that exceeds a three to one ratio is excessive); State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 424-25, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (holding that punitive damages *82 should rarely exceed a single-digit multiple of compensatory damages).
In this case, the jury awarded Mrs. Alexander $20 million in compensatory damages, which the trial court later remitted to $10 million, and $25 million in punitive damages, which the trial court found to be reasonable and supported by the evidence. Therefore, regardless of whether we compute the ratio of the amount of the punitive damages award to the compensatory damages award before the remittitur, resulting in a ratio of 1.25 to 1, or after the trial court’s remittitur of the compensatory damages award to $10 million, a 2.5 to 1 ratio, the award does not exceed the parameters of section 768.73 or of the United States Constitution. Townsend, 90 So.3d at 314 (computing the ratio of punitive to compensatory using the pre-apportionment amount of compensatory damages); Martin, 53 So.3d at 1071 (same); see, e.g., R.J. Reynolds Tobacco Co. v. Townsend, 118 So.3d 844, 2013 WL 2631879, 38 Fla. L. Weekly D1320 (Fla. 1st DCA June 13, 2013) (affirming a punitive to compensatory damage ratio of 1.85 to 1); Kayton, 104 So.3d at 1152 (approving a punitive to compensatory damages award ratio of 2 to 1); Martin, 53 So.3d at 1172 (approving a punitive to compensatory damages award ratio of 7.58 to 1); Campbell, 538 U.S. at 424-25, 123 S.Ct. 1513.
Under Florida law, a punitive damages award must satisfy three criteria in order to pass constitutional muster:
(1) “the manifest weight of the evidence does not render the amount of punitive damages assessed out of all reasonable proportion to the malice, outrage, or wantonness of the tortious conduct;” (2) the award “bears some relationship to the defendant’s ability to pay and does not result in economic castigation or bankruptcy to the defendant;” and (3) a reasonable relationship exists between the compensatory and punitive amounts awarded.
Martin, 53 So.3d at 1072 (quoting Engle, 945 So.2d at 1263-64). We easily dispose of the second requirement, since Lorillard has not claimed, nor can it claim, that this award will cause the multi-billion dollar company financial ruin.
Of the three factors weighing in our analysis, “the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant’s conduct.” BMW of N. Am., Inc., 517 U.S. at 575, 116 S.Ct. 1589. As to that factor, we conclude the $25 million punitive damages award is supported by the manifest weight of the evidence and is not “out of all reasonable proportion to the malice, outrage, or wantonness of [Lorillard’s] tortious conduct.” Id. In measuring the reprehensibility of a defendant’s conduct the Court may consider whether:
the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.
Campbell, 538 U.S. 408 at 419, 123 S.Ct. 1513, 155 L.Ed.2d 585.
As detailed in our earlier discussion on whether the punitive damages award was based on conduct by other tobacco companies, we conclude that this record is replete with evidence of Lorillard’s conduct, which the jury and the trial court could find sufficiently reprehensible to warrant the imposition of sanctions in the form of the $25 million punitive damages award. The plaintiff provided more than sufficient evidence to show Lorillard’s conduct, both *83 individually and as a member of the tobacco industry, of continuous, repeated, and aggressive attempts to discredit the scientific research revealing the harmful and addictive nature of cigarettes and to cast doubt on the validity of the scientific research by mounting advertising and public relations campaigns. The plaintiff similarly provided evidence of more than a half-century of Lorillard’s reckless disregard of the scientific findings and of its indifference to the potential physical harm to consumers caused by its product for its own purely economic gain. Surely, the manifest weight of the evidence against Loril-lard and its co-conspirators “evinced an indifference to or a reckless disregard of the health or safety of others.” Id.
This Court’s view that the punitive damages award of $25 million is not constitutionally excessive is reflected and confirmed by the multiple punitive damage awards imposed by our sister courts in Engle-progeny cases with similar facts. See, e.g., R.J. Reynolds Tobacco Co. v. Townsend, 118 So.3d 844, 2013 WL 2631879, 38 Fla. L. Weekly D1320 (finding punitive damages award in the amount of $20 million did not violate constitutional due process); Kayton, 104 So.3d at 1152 (approving a $16 million punitive damages award); Martin, 53 So.3d at 1072 (finding that a $25 million punitive damages award even with a ratio of 7.58 to 1 to compensatory damages in the amount of $3.3 million did not violate due process by underscoring that neither the Florida Supreme Court nor the United States Supreme Court have adopted a bright-line ratio limit that a punitive damages award must meet in order to be considered constitutional).
Based on the foregoing facts and authorities, we hold that the $25 million punitive damages award in this case was not unconstitutionally excessive.
Affirmed.

. Engle v. Liggett Grp., Inc., 945 So.2d 1246, 1254-57 (Fla.2006).

. See, e.g., Bauta v. State, 698 So.2d 860, 861— 62 (Fla. 3d DCA 1997) ("The decision whether to dismiss any or all jurors lies in the sound discretion of the trial judge.”) (quoting *72 United States v. Jones, 696 F.2d 479, 492 (7th Cir.1982)); Hudson v. State, 992 So.2d 96, 107 (Fla.2008) ("We review a trial court’s decision to admit evidence under an abuse of discretion standard.”); Glabman v. De La Cruz, 954 So.2d 60, 62 (Fla. 3d DCA 2007) ("[A] trial judge’s decision to grant or deny remittitur ‘comes to us properly boxed in the wide discretion of the trial court ... carefully wrapped in presumption of correctness and securely tied with the strong cord of a jury verdict.' ”) (quoting Smith v. Goodpasture, 179 So.2d 240, 240-41 (Fla. 2d DCA 1965)).

. Citing to Olivas v. Peterson, 969 So.2d 1138 (Fla. 4th DCA 2007), Lorillard alleges that section 768.74 does not require an express objection to a remittitur in order to preserve entitlement to a new trial under the statute. This misrepresents Olivas, which explicitly states that entitlement to a new trial requires that the record clearly evidence that the party seeking a new trial did not consent to a remit-titur or additur. The court in Olivas found clear record evidence that the parties did not agree to a remittitur when the parties immediately disagreed with the remitted amount and argued that a new trial was the only truly appropriate remedy. Id. at 1140. The record here does not clearly or even impliedly evidence that Lorillard rejected the remittitur. The record only reveals that Lorillard's counsel objected to the $20 million award as excessive and asked the trial court to consider other awards upheld by appellate courts. Lorillard’s counsel expressed that the award should be remitted to below $10.8 million (the amount awarded in R.J. Reynolds Tobacco Co. v. Townsend, 90 So.3d 307, 311 (Fla. 1st DCA *78 2012)) and, in his opinion, "substantially less than $10.8 million,” and concluded the hearing on remittitur by saying that he would leave it in the court’s hands. Most tellingly, however, when the remitted amount was announced, Lorillard made no objection to the court’s ruling. Contrary to the record in Oli-vas, this record does not evidence any objection to the remitted award.