# Third District Court of Appeal

## State of Florida

Opinion filed October 29, 2025.

_____

No. 3D21-2214
Lower Tribunal No. 17-18509
_____

**Philip Morris USA Inc.,**
Appellant,

vs.

**Michael Jordan Lipp, etc.,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Peter R. Lopez, Judge.

Arnold & Porter Kaye Scholer, and David M. Menichetti (Washington, DC); Shook, Hardy & Bacon L.L.P., and Michael Rayfield and Scott A. Chesin (New York, NY), for appellant.

The Alvarez Law Firm, and Alex Alvarez, Michael Alvarez, Nicholas Reyes and Philip Holden; David J. Sales, P.A., and David J. Sales (Sarasota), for appellee.

Before EMAS, GORDO and BOKOR, JJ.

BOKOR, J.

## ON MOTION FOR REHEARING

We deny the motion for rehearing, but withdraw our previous opinion and substitute the following:

In this Engle[1] progeny case, Philip Morris USA, Inc. ("PM USA") appeals from a final judgment entered in favor of Michael Jordan Lipp, as personal representative of the Estate of Norma K. Lipp, following a jury trial. At trial, counsel for the Estate solicited hearsay statements from Mrs. Lipp's surviving children over objection. Counsel for the Estate incorporated these hearsay statements into the closing argument. The Estate, as the beneficiary of the improper testimony and statements, must show no reasonable probability that the error did not contribute to the verdict. We reverse because we conclude that the Estate does not meet this burden.

## BACKGROUND

For decades, Mrs. Lipp smoked filtered cigarettes, sometimes more than a pack per day. In 1992, Mrs. Lipp was diagnosed with lung cancer. She passed away the following year. In 2007, Mrs. Lipp's son filed the instant wrongful death lawsuit against PM USA on behalf of his mother's estate, asserting claims of strict liability, negligence, fraudulent concealment, and

---

[1] Engle v. Liggett Grp., Inc., 945 So. 2d 1246 (Fla. 2006).

2

conspiracy to conceal. The case went to trial in March 2020, but the trial court declared a mistrial because of the COVID-19 pandemic. The case was retried in August 2021.

At trial, the Estate called Mrs. Lipp's sons, A.J. and Michael, as witnesses. In relaying a conversation with his mother, A.J. testified:

> Q. After she had her lung removed, okay, did she ever express to you that she was upset?
>
> A. Yeah.
>
> Defense counsel: Objection. Hearsay.
>
> . . . .
>
> Court: Overruled.
>
> Q. Did she express it to you after her lung was removed?
>
> Court: Overruled.
>
> A. Okay. Yeah. After her surgery, she was very upset at the tobacco companies specifically.
>
> Defense counsel: Objection. Hearsay.
>
> Court: Overruled.
>
> A. *Because she was upset at the tobacco companies because they told her that filtered cigarettes – that filters would filter out the bad stuff and keep her safe* and she knew once she got lung cancer and had her lung removed that the filter didn't keep her safe and didn't filter out the bad stuff.

(emphasis added). Michael provided the following testimony:

> Q. Now, I want to ask you about another conversation you had with your mom. After she was diagnosed with lung cancer, did you ever have a conversation with your mom where she appeared angry to you?

3

A. Yes.

Q. Okay. Did she tell you at that time why she was feeling angry?

Defense counsel: Objection. Hearsay.

Court: Overruled.

A. So we talked about the trip to California. So we took that trip.

Q. Was this the last vacation the family took with her?

A. Yeah. It was — my mom kind of wanted to go on a last trip as a family. But I didn't know it was the last trip. She knew that. And, you know, my brother, sister, my dad was around. There was kind of — we were kind of in — I think it's the hotel room, just the two of us. We don't get that much alone time. And we talked, and she was angry. And she was angry she was dying. She was angry at the tobacco companies.

Q. Did she tell you why she was angry at the tobacco companies?

A. She said, *"They lied to me."* She said—

Defense counsel: Objection. Hearsay.

Court: Overruled.

A. So she was mad that she was dying. She said, "*Cigarette companies lied to me*. I wish I'd never smoked." And then she made me promise that I would never smoke.

(emphasis added). The Estate's counsel later highlighted the above statements during closing arguments, telling the jury: "She was angry when she found out that she was lied to. She believed them, that filters were going to keep her safe, that it was safer." The jury returned a verdict for the Estate and against PM USA, awarding the former a total of $43 million in damages—$15 million in compensatory damages and $28 million in punitive

4

damages. After the trial court denied all of PM USA's post-trial motions, this appeal followed.

## ANALYSIS

On appeal, PM USA contends, among other things, that the trial court erred in allowing inadmissible hearsay statements to be introduced. PM USA maintains that Mrs. Lipp's statements, presented through A.J. and Michael's testimonies, were backward-looking and not offered for the purpose of showing Mrs. Lipp's state of mind at the time of the conversation. We first determine that the challenged statements constitute impermissible hearsay. We then hold that, upon an examination of the hearsay statements in context, the Estate, as the beneficiary of the impermissible statements, failed to demonstrate harmless error.

## I.

We review the trial court's rulings on the admissibility of evidence for an abuse of discretion, but the legal question of whether a statement is hearsay is reviewed de novo. Cannon v. State, 180 So. 3d 1023, 1037 (Fla. 2015). A hearsay statement is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." § 90.801(1)(b), Fla. Stat. "However, the same statement may be admissible to prove a variety of issues besides the

truth of the matter, such as the declarant's state of mind." <u>Everett v. State</u>, 801 So. 2d 189, 191 (Fla. 4th DCA 2001). This hearsay exception requires:

> (a) A statement of the declarant's then-existing state of mind, emotion, or physical sensation, including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health, when such evidence is offered to:
>
> > 1. Prove the declarant's state of mind, emotion, or physical sensation at that time or any other time when such state is an issue in the action.
> >
> > 2. Prove or explain acts of subsequent conduct of the declarant.

§ 90.803(3)(a), Fla. Stat. In essence, statements of the declarant's then-existing state of mind "are admissible to prove or explain the declarant's subsequent conduct or to prove the declarant's state of mind at the time that the statement was made or at any other time, but only when such a state is an issue in the action." <u>Lorillard Tobacco Co. v. Alexander</u>, 123 So. 3d 67, 75 (Fla. 3d DCA 2013). Another exception applies for after-the-fact statements. <u>See</u> § 90.803(3)(b), Fla. Stat. ("[T]his subsection does not make admissible . . . [a]n after-the-fact statement of memory or belief to prove the fact remembered or believed . . . ."). "[A] hearsay statement which recounts 'observations made previously' is by definition an 'after-the fact statement of memory' and expressly excluded from the state of mind exception." <u>R.J.</u>

6

Reynolds Tobacco Co. v. Hamilton, 316 So. 3d 338, 342 (Fla. 4th DCA 2021) (quoting in part § 90.803(3)(b)1., Fla. Stat.).

So the question becomes, do Mrs. Lipp's statements constitute a proper hearsay exception such as permissible then-existing state of mind, or impermissible after-the-fact statements of memory? We conclude they are the latter. In the underlying proceedings, the trial court permitted A.J. to testify, over contemporaneous objection, that after Mrs. Lipp's lung was removed, she recollected that the tobacco companies represented to her that filtered cigarettes would "filter out the bad stuff and keep her safe." It further permitted Michael to testify over objection that, after his mother was diagnosed with lung cancer in 1992, she told him that the cigarette companies had previously lied to her. Both statements from the two sons contained testimony that goes to a central issue of the case—Mrs. Lipp's reliance on the tobacco companies' lies regarding the safety of filtered cigarettes.

On appeal, PM USA properly distinguishes Alexander, 123 So. 3d 67, from this case. There, the decedent's wife testified that she tried to persuade the decedent to stop smoking, and up until 1985, the decedent told her he believed filtered cigarettes were safe and that he did not believe the tobacco companies would make a product that would kill people. Id. at 71. As this

7

court concluded in Alexander, "those statements were not after-the-fact statements of why [the decent] smoked in the past" as they were here, "rather they were statements as to why [he] continued to smoke at that time." Id. at 75; see also Philip Morris USA Inc. v. Holliman, 374 So. 3d 87, 93 n.9 (Fla. 3d DCA 2022) ("Holliman's out-of-court statement that 'cigarettes was [sic] not bad for you' was admissible because it was offered to show Holliman's material state of mind—his belief that smoking was not bad for him—and not to prove that cigarettes were, indeed, not bad for health.").

The Fourth District's decision in Hamilton, 316 So. 3d 338, another case on which PM USA relies, is also instructive in analyzing the state of mind exception to hearsay. There, the court held the decedent's statement to her son that she believed filtered cigarettes were safe, because of tobacco companies' advertising, not admissible under the state of mind exception. Id. at 340–42. Our sister court concluded that the relevant portion of the decedent's statement didn't disclose anything about her state of mind. Instead, "it simply stated a fact: [the decedent] previously heard filtered cigarettes were safe from advertising and not from some other source." Id. at 341. Here, the challenged testimony that Mrs. Lipp was mad or angry wasn't offered to prove her then-existing state of mind. Instead, such testimony was offered to show the reason she was mad—that the tobacco

companies, and not some other source, lied to Mrs. Lipp, and most importantly, that she relied on those lies to continue smoking.

The challenged statements from Mrs. Lipp's sons weren't offered to establish why Mrs. Lipp *currently* smoked filtered cigarettes or her reasoning in continuing to do so. By the time she made those statements, she had quit smoking. Rather, the statements were "after-the-fact statements of why [Mrs. Lipp] smoked in the past." Alexander, 123 So. 3d at 75. Further, and like Hamilton, Mrs. Lipp's statements were offered to reinforce that the tobacco companies lied to her in the past, and the statements regarding her anger reinforced her reliance on the tobacco companies' lies.[2]

---

[2] Hamilton explains that the simple fact that the statement may contain a portion of admissible, state-of-mind testimony doesn't change its overall character:

> Plaintiff also argues that the statement was admissible because "most states of mind are going to be based on knowledge gained and observations made previously." However, a hearsay statement which recounts "observations made previously" is by definition an "after-the fact statement of memory" and expressly excluded from the state of mind exception. § 90.803(3)(b) 1., Fla. Stat. What Plaintiff is attempting to do is "piggyback" an otherwise inadmissible backward-looking statement onto an admissible statement. Doing so, however, both ignores and undermines the rule against hearsay. See Shepard v. United States, 290 U.S. 96, 105–06, 54 S.Ct. 22, 78 L.Ed. 196 (1933) (noting that if the distinction between forward looking statements

## II.

Next, we examine whether the erroneous hearsay statements constituted harmless error. "Errors in evidentiary rulings in civil cases are subject to harmless error analysis." Hamilton, 316 So. 3d at 342. "To test for harmless error, the beneficiary of the error has the burden to prove that the error complained of did not contribute to the verdict. Alternatively stated, the beneficiary of the error must prove that there is no reasonable possibility that the error contributed to the verdict." Special v. W. Boca Med. Ctr., 160 So. 3d 1251, 1256 (Fla. 2014). "[T]he court's obligation is to focus on the effect of the error on the trier-of-fact and avoid engaging in an analysis that looks only to the result in order to determine harmless error." Mesa v. Citizens Prop. Ins. Corp., 358 So. 3d 452, 457 (Fla. 3d DCA 2023) (quoting Special, 160 So. 3d at 1256).

---

and backward looking statements is ignored, "[t]here would be an end, or nearly that, to the rule against hearsay"); Reed v. State, 438 So. 2d 169, 172 (Fla. 1st DCA 1983) (Ervin, C.J., specially concurring) ("The reason for excluding after-the-fact statements of memory is that '[i]f these statements were admitted it would be easy for any individual to manufacture evidence to prove facts that had occurred in the past.' " (quoting Charles W. Ehrhardt, 1 Fla. Prac., Evidence § 803.3B (1977))).

Hamilton, 316 So. 3d at 342.

10

Here, the central theory to the Estate's case was that tobacco companies deceived Mrs. Lipp into believing that smoking filtered cigarettes was safer than smoking non-filtered cigarettes. See Prentice v. R.J. Reynolds Tobacco Co., 338 So. 3d 831, 837 (Fla. 2022) (describing elements for "Engle progeny" claims of conspiracy and fraudulent concealment against tobacco companies, including how "plaintiff must prove reliance on a statement . . . that concealed or omitted material information about the health effects or addictiveness of smoking cigarettes"). The Estate advanced this theory through the testimonies of Mrs. Lipp's two sons, including the challenged hearsay statements that the tobacco companies lied to her. The centrality of these hearsay statements to the Estate's case was emphasized during closing arguments: "She was angry when she found out that she was lied to. She believed them, that filters were going to keep her safe, that it was safer." The hearsay statements and the reference to them during closing argument were essential to the Estate's successful efforts to show that Mrs. Lipp herself relied on advertising and marketing statements made by PM USA regarding the supposed safety of filtered cigarettes.

Even with the Engle findings and the resulting finding and stipulation that PM USA and the tobacco companies lied and misled the public

11

regarding the safety of filtered cigarettes, the Estate must still prove Mrs. Lipp's reliance on these lies. Cf. Philip Morris USA, Inc. v. Chadwell, 404 So. 3d 460, 467 (Fla. 3d DCA 2024) (finding insufficient evidence of reliance on tobacco advertising statements where plaintiff's case hinged on wife's statement that decedent smoked light cigarettes because he thought they were healthier); R.J. Reynolds Tobacco Co. v. Whitmire, 260 So. 3d 536, 541 (Fla. 1st DCA 2018) ("[T]he fact that the decedent saw advertising [alone] cannot prove reliance, as she may or may not have internalized the false statements in the advertisements and changed her behavior accordingly."). Even if some of the information conveyed by the hearsay statements is cumulative to other testimony, our inquiry does not end there. "The cases concerning cumulative evidence do not stand for the proposition that an error in the admission of evidence is harmless simply because there is additional admissible evidence in the record to support the ultimate result below." Witham v. Sheehan Pipeline Constr. Co., 45 So. 3d 105, 109 (Fla. 1st DCA 2010); see also Smith v. Hooligan's Pub & Oyster Bar, Ltd., 753 So. 2d 596, 601 (Fla. 3d DCA 2000) (holding that cumulative evidence was nonetheless harmful).

The Estate, and the dissent, contend that the introduction of the hearsay evidence was cumulative to other properly admitted testimony of the

sons and the husband and constitutes at most harmless error. This is incorrect for several reasons. As the dissent correctly notes, "[i]n applying the harmless error test, we must consider the entire record, not in a vacuum, but in the context in which the testimony was introduced." The sons' inadmissible testimony is not necessarily harmless, or even cumulative, if it proves the same point as other evidence that was properly admitted. We must look to context. The inadmissible hearsay testimony on the substantive issue of Mrs. Lipp's reliance on the tobacco companies' statements was perhaps more credible than the properly admitted evidence on the same issues. Moreover, the fact that the tobacco companies misrepresented— even lied—about the relative safety of the product would be subsumed by the Engle findings. But the fact that Mrs. Lipp relied on such misrepresentations is at issue and to be determined by the factfinder. Indeed, the hearsay statements go to the heart of Mrs. Lipp's personal reliance on PM USA's misrepresentations and contain significant evidentiary value to prove Mrs. Lipp's reliance on those misrepresentations about the safety of filtered cigarettes. See Hamilton, 316 So. 3d at 342–43 ("[C]onsidering the strong evidentiary value of [the decedent's] statement, it cannot be said there is no reasonable possibility that the error contributed to the verdict.").

13

It rings true that a person might blame her cancer diagnosis and surgery on the lies of a tobacco company after those lies are publicly revealed (the impermissible, backwards-looking hearsay statements). It may ring less true to a jury that she would offer nearly spontaneous professions of faith in those lies to her family before the lies are exposed and before her cancer diagnosis and surgery (the permissible, unobjected-to present sense expression statements). This isn't to say that the jury wouldn't have come to the same verdict without the hearsay statements. Yet we must apply the test set forth in Special and conclude that the beneficiary of the error didn't meet its "burden to prove that the error complained of did not contribute to the verdict." 160 So. 3d at 1256.

The hearsay statements also had a different narrative resonance. Because of the trial court's error in admitting this hearsay, the movant introduced emotionally charged imagery about Mrs. Lipp's recollections and thoughts, not at the time she was smoking, but in her hospital bed after both her cancer diagnosis and surgery and during one final trip with her beloved sons. A.J. mentioned his mother's statements after counsel twice questioned if the statements came after her surgery to remove a lung. Michael's testimony of his mother's statements to him during the "last vacation the family took with her" when she was "dying" not only constituted impermissible

14

hearsay but also possibly impacted the verdict. There is nothing cumulative about that portion of the testimony, and the beneficiary of the error can't show the absence of at least a "reasonable possibility" that the emotional appeal of such impermissible and inflammatory statements didn't contribute to the verdict, including the punitive damages award. See, e.g., Chambers v. State, 924 So. 2d 975, 978–79 (Fla. 2d DCA 2006) (recognizing that inflammatory statements that invoked the "sympathy or anger of the jury" may have improperly "influenced the jury to reach a more severe verdict than it would have otherwise rendered"). Context matters. Because of the emotional appeal of these backwards-looking hearsay statements, grounded in such tragic circumstances, Lipp cannot demonstrate no "reasonable possibility" that the hearsay statements did not "contribute to the verdict." Special, 160 So. 3d at 1256.

We do not substitute our judgment for the jury's and reweigh the evidence. See State v. DiGuillio, 491 So. 2d 1129, 1139 (Fla. 1986). And we aren't doing that here. But we can examine the effect of the error on the jury. Id. And here, we cannot ignore that the jury awarded a substantial punitive damages award coupled with the largest Engle punitive damages verdict in Florida history. This undermines the Estate's—and the dissent's—harmlessness argument. The Second District's analysis in Philip Morris USA,

15

Inc. v. Duignan, 370 So. 3d 978 (Fla. 2d DCA 2023), proves instructive. There, the court determined that "because an error occurred on two of the underlying claims on which punitive damages may have been based in this case, i.e., the fraud claims," the beneficiary of the error could not prove harmlessness under the Special test. Id. at 987. In determining that the error couldn't be held as harmless, the court explained that in deciding punitive damages, "the jury [was instructed to] rely on evidence that was introduced relating to the fraud claims." Id. In that case, the court concluded that "we cannot say that the punitive damages determinations were not affected by the error on the fraud claims" where the jury relied on improper evidence and "awarded $12 million against each tobacco company" in punitive damages—approximately $2.5 million more from each defendant than the plaintiff asked for. Id. In our case, the Estate introduced the error in proving reliance and compounded the error by reintroducing the hearsay during closing, resulting in the largest punitive Engle verdict to date. We likewise cannot say that such a determination was not affected by the error.

### III.

In reaching our conclusion, we emphasize all we are doing is applying the harmless error test as drafted and as interpreted by binding case law. The harmless error statute, section 59.041, Florida Statutes, provides:

> No judgment shall be set aside or reversed, or new trial granted by any court of the state in any cause, civil or criminal, on the ground of misdirection of the jury or the improper admission or rejection of evidence or for error as to any matter of pleading or procedure, unless in the opinion of the court to which application is made, after an examination of the entire case it shall appear that the error complained of has resulted in a miscarriage of justice. This section shall be liberally construed.

The statute promotes finality and limits the granting of new trials to cases where the error complained of results in "a miscarriage of justice." But we determine what constitutes a "miscarriage of justice" through the procedure described above, where the beneficiary of the error must "prove that the error complained of did not contribute to the verdict." Special, 160 So. 3d at 1256.

And this burden involves the effect of the errors on the judicial *process* as much as the *result* of the trial:

> We observe that this test is consistent with the harmless error rule codified in section 59.041, and the Legislature's intent that relief be granted only in the event of "a miscarriage of justice." An appellate court's harmless error analysis is not limited to the result in a given case, but it necessarily concerns the process of arriving at that result. "A large word like justice, incorporated into a rule governing harmless error, compels an appellate court to concern itself not alone with a particular result but also with the very integrity of the judicial process." Roger J. Traynor, *The Riddle of Harmless Error* 17 (1970). By focusing on the effect of the error on the trier-of-fact, the appellate court will evaluate harmless error in a manner that is consistent with section 59.041.

> Moreover, the application of the no reasonable possibility test for harmless error in civil appeals will serve multiple purposes. The test acts in a manner so as to conserve judicial resources while protecting the integrity of the process. Additionally, the test

17

strikes the proper balance between the parties. While the party that seeks relief must still identify the error and raise the issue before the appellate court, this test properly places the burden of proving harmless error on the beneficiary of the error. Requiring the beneficiary of the error to demonstrate that there is no reasonable possibility that the error contributed to the verdict discourages efforts to introduce error into the proceedings.

Id. at 1257. In the case Special reversed, the Fourth District explained that in interpreting the harmless error rule, Florida case law trended "away from a 'correct result' test" initially applied to determine the presence of harmless error, "and toward an 'effect on the fact finder' test as embodied" in DiGuilio. Special v. Baux, 79 So. 3d 755, 760 (Fla. 4th DCA 2011). We are mindful of this requirement of liberality in the statute, coupled with the "effect on the fact finder" test, in determining whether the beneficiary of the error can demonstrate lack of prejudice:

> The 1911 harmless error statute differs in one important respect from the A.B.A. model set forth in footnote 9. The Florida statute adds the last sentence: "This section shall be liberally construed." While a "strict construction" of a statute would consider "only the literal words of [the] writing," a liberal construction is "[a]n interpretation that applies a writing in light of the situation presented and that tends to effectuate the spirit and purpose of the writing." *Black's Law Dictionary* 332 (8th ed. 2004). The purpose of the harmless error statute is to enhance finality by limiting the granting of new trials. However, by insisting on a liberal construction, the statute allows for discretion and flexibility in its interpretation; the term "miscarriage of justice" should not be construed so narrowly that reversal is a rarity.

18

Id. at 761–62; see also Henderson v. State, 113 So. 689, 698 (Fla. 1927) (explaining that former 1911 harmless error statute was "based upon the idea that if the result of a trial, the verdict and judgment, was just and right, even though there were technical errors committed by the trial court, no good purpose could be subserved by the labor, expense, and delay of trying the case over again"); Seadler v. Marina Bay Resort Condo. Ass'n, Inc., 376 So. 3d 659, 667 (Fla. 2023) (rejecting comparison to federal harmless error standard and noting that "[n]either the federal courts nor the other state courts adopting that standard apply both Florida's unique preservation rules in this context and our harmless error standard as announced in Special"). Although the Florida Supreme Court reversed Baux, it did so by affirming the historical reading Baux advocated and applying that standard uniformly in both civil and criminal contexts. Special, 160 So. 3d at 1256.

We do not dispute the dissent's position that cumulative testimony can be harmless in some contexts. But as explained, it is indeed a fact-specific analysis. See, e.g., Seadler, 376 So. 3d at 667 (noting in the context of the erroneous denial of a cause challenge in jury selection that this is not "'per se' reversable error" and the "parties will need to advance, and courts will need to apply, a fact-specific harmless error analysis"). As the Florida Supreme Court has explained, "the harmless error analysis is *not* an

19

'overwhelming-evidence test.'" <u>Ventura v. State</u>, 29 So. 3d 1086, 1089 (Fla. 2010) (quoting <u>DiGuilio</u>, 491 So. 2d at 1139). The dissent can't get around the fact that gut-wrenching, emotional hearsay testimony was introduced in error and repeated in closing. Instead, the dissent presents a carefully constructed, intellectual argument why the jury may not have been influenced and may have reached the same verdict relying on evidence that is partially, but not entirely, cumulative. It makes a compelling case why a jury could, or even should, reach the verdict it does on admissible evidence. But that's not the standard. And the dissent's 50-plus pages of parsing and recounting trial evidence to reach its result reveals its fundamental analytical flaw. It ends up shifting the burden. Or, at a minimum, it avoids the "effect on the factfinder" test and relies on the "correct result" test for harmless error that the Florida Supreme Court disapproved in <u>DiGiglio</u> and <u>Special</u>.

In <u>Seadler</u>, the Florida Supreme Court explained that the First District erred by applying its own statutory "'miscarriage of justice' test without acknowledging our analysis and holding in <u>Special</u>. In doing so, the First District inverted the standard and denied Seadler's requested relief because of 'the absence of a demonstration by Seadler that a miscarriage of justice stemmed from the asserted error by the trial court.'" 376 So. 3d at 666. Here, the dissent follows the same primrose path. The dissent focuses on the

20

preclusive effects of the <u>Engle</u> findings, the cumulative nature of the testimony presented to those <u>Engle</u> findings, the limited number of issues to be resolved by the jury, and the (arguable) lack of impact the errors contributed to the outcome of those *issues*. But this amounts to the same flaw, repackaged. In ignoring the impact of the improper statements on the *jury's* perception of the trial and the possible impact the statements had on the overall verdict, including Mrs. Lipp's reliance on the misrepresentations, the dissent in effect shifts the burden and dismisses the error because of "the absence of a demonstration by [PM USA] that a miscarriage of justice stemmed from the asserted error by the trial court." <u>Id.</u>

## CONCLUSION

We therefore hold that the trial court reversibly erred in admitting the inadmissible hearsay statements and reverse and remand for a new trial.[3]

Reversed and remanded.

GORDO, J., concurs.

---

[3] Because we conclude that the hearsay statements provide a basis for reversal and new trial, we need not address the issues of jury selection and the punitive damages award.

21

GORDO, J., concurring.

The right to a fair and impartial jury trial is fundamental to our constitutional republic. Appellate courts have a duty to preserve inviolate this right and respect the jury's verdict—so long as it is rightfully rendered. See Shoma Coral Gables, LLC v. Gables Inv. Holdings, LLC, 387 So. 3d 336, 347 (Fla. 3d DCA 2023) (Gordo, J., concurring) ("In Florida, where cases are properly submitted to a jury for a determination of competing facts—judges do not—and cannot, act as the seventh juror and override that finding unless no proper view of the evidence could sustain the jury's verdict."); Salazar v. Gomez, 317 So. 3d 170, 174 (Fla. 3d DCA 2021) ("[W]here the court heard no new evidence other than what was known prior to trial and presented to the jury, where the moving party sought no relief prior to or during trial and where the alleged inconsistencies were subject to impeachment, cross-examination and jury deliberation, we are constrained to conclude the trial court abused its discretion in overturning the verdict and dismissing the case.").

But here, the impact of the inadmissible hearsay statements on *this* verdict cannot be ignored. The plaintiff built his case around the claim that the defendant deceived Mrs. Lipp into believing that filtered cigarettes were

22

safer, and he was able to advance this theory not through a "snippet" of cumulative testimony as the dissent posits, but through lengthy and highly prejudicial inadmissible hearsay statements made by two separate witnesses—Mrs. Lipp's sons. Knowing that this testimony could evoke sympathy in the minds of the jurors, experienced trial lawyers used these improper and highly prejudicial statements to paint a detailed picture—one that graphically illustrated two independent, emotional conversations between a dying mother and her loving sons. Each of these conversations took place in a tragic setting—one after the devastating removal of Mrs. Lipp's lung, the other on what would be the family's final trip together. The latter exchange, set in the hotel room on this fateful vacation, spotlighted some of the last shared moments between the plaintiff and his mother. These same lawyers later highlighted this inflammatory testimony during closing argument, specifically emphasizing Mrs. Lipp's indignant anger and blame towards the defendant. While the dissent makes a valiant attempt to minimize the improper hearsay to a "few lines of testimony" and "one sentence" during closing argument, it is inescapable that this testimony— and the harmful mental images it created—was clearly and repeatedly used by counsel to inflame the jury. See R.J. Reynolds Tobacco Co. v. Robinson, 216 So. 3d 674, 683 (Fla. 1st DCA 2017) (reversing for a new trial "[o]n such

23

a record, so replete with improper arguments and comments clearly intended to stir the passions of the jury"). But see Nolley v. State, 237 So. 3d 469, 476 (Fla. 1st DCA 2018) (finding the error did not rise to the level of fundamental error because "[t]he erroneous testimony was brief" and "did not become the focus of the trial").

Our caselaw is clear that where there is error, the proponent of the error must dispel all notions that the error contributed to the verdict. See Special v. W. Boca Med. Ctr., 160 So. 3d 1251, 1256 (Fla. 2014) ("To test for harmless error, the beneficiary of the error has the burden to prove that the error complained of did not contribute to the verdict. Alternatively stated, the beneficiary of the error must prove that there is no reasonable possibility that the error contributed to the verdict."). From the tone and tenor of this improper testimony, the impassioned closing argument and this verdict being the largest ever awarded in any similar tobacco case in the country—the record leaves little doubt that the plaintiff has not carried his burden of proving that this error did not contribute to the verdict. See Samuels v. Torres, 29 So. 3d 1193, 1196 (Fla. 5th DCA 2010) ("No citation of authority is necessary for the well-established principle that **all parties** are entitled to a fair trial. To that end, the law imposes upon a jury the duty to impartially determine the facts and decide the issues in each case based on the

24

evidence presented and the applicable law.  Fidelity to that duty prohibits a jury from being swayed by sympathy for any party when rendering its verdict. A soft heart infused with pity proclaims sympathy, not facts based on evidence, and there are no rules of law that guide its direction.") (emphasis added) (footnote omitted); Murphy v. Int'l Robotic Sys., Inc., 766 So. 2d 1010, 1028 (Fla. 2000) (recognizing the prejudicial effect of statements that "inflame the minds and passions of the jurors" (quoting Bertolotti v. State, 476 So. 2d 130, 134 (Fla. 1985))); Chambers v. State, 924 So. 2d 975, 978-79 (Fla. 2d DCA 2006) (recognizing that inflammatory statements that invoked the "sympathy or anger of the jury" may have improperly "influenced the jury to reach a more severe verdict than it would have otherwise rendered").

While the consequence is unfortunate, parties proceed at their own peril when they choose to overstep and inject sympathy and prejudice into the minds of jurors, particularly in a case where legitimate and obvious sentiments may already exist.  See R.J. Reynolds Tobacco Co. v. Calloway, 201 So. 3d 753, 765 (Fla. 4th DCA 2016) (cautioning counsel to be vigilant in crafting arguments that fall within the confines of permissibility and stating that "[a]ttorneys who engage in such [improper] tactics in the future do so at

their own peril, and the peril of their clients, by risking the reversal of their cases on appeal").

EMAS, J., dissenting.

I.      **INTRODUCTION**

Mrs. Norma Lipp began smoking before 1969, was diagnosed with lung cancer in 1992, and died in 1993, leaving behind her husband, Jules and her three minor children, Michael, A.J. and Tracie.  This wrongful death lawsuit, filed by Norma's estate ("Plaintiff") on behalf of her surviving family, asserted Norma was a member of the Engle[4] class of plaintiffs, and included claims against Philip Morris[5] for fraudulent concealment and conspiracy to engage in fraudulent concealment—i.e., that Philip Morris, engaged in false and misleading advertising and marketing, and concealed or omitted (and conspired with other tobacco companies to conceal or omit) material information regarding the health effects or addictive nature of smoking, knowing that such information was false and misleading, and with the intent that smokers would rely on this information. In particular, Plaintiff contended Norma switched from unfiltered to filtered cigarettes, in reliance on Philip

---

[4] Engle v. Liggett Grp., Inc., 945 So. 2d 1246 (Fla. 2006).
[5] Also named as defendants in the complaint were R.J. Reynolds Tobacco Co., Liggett Group LLC and Vector Group, Ltd., Inc.  By the time the case proceeded to trial, only Philip Morris remained as a defendant.

Morris' advertising and marketing that filter cigarettes were safer than unfiltered cigarettes.

In addition to compensatory damages, Plaintiff sought punitive damages against Philip Morris and as a deterrent to others. As such, the trial court instructed the jury that it was permitted to "consider harms suffered by other persons not a party to this lawsuit in assessing the reprehensibility or wrongfulness of the conduct that caused Mrs. Lipp's lung cancer and death." See Fla. Std. Jury Instr. (Civ.) 503.2(b)(5).

At the conclusion of the fifteen-day trial, the jury returned a verdict in favor of Plaintiff and awarded compensatory damages to her husband Jules and her three children.[6] The jury also awarded punitive damages against Philip Morris.

The testimony of Norma's sons, Michael and A.J., included many statements made by their mother during the time she was still smoking cigarettes, as well as statements she made after she had been diagnosed with lung cancer and underwent surgery to remove one of her lungs. While a minor portion of these statements may have constituted hearsay, any error in their admission was harmless, given that these snippets of testimony: 1) were not made a feature during trial, but instead consisted of four lines of a

---

[6] Michael, A.J. and Tracie were all minors when Norma died in 1993.

trial transcript containing spanning 3600 pages, and a record exceeding 10,000 pages; 2) were cumulative to the **admissible and unobjected-to testimony provided by these very same two witnesses**; 3) were cumulative to the **admissible and unobjected-to testimony provided by Norma's husband Jules**; 4) were not made a feature in closing argument, but rather consisted of a single sentence in closing, referring to excerpted testimony of **both** the **admissible** and **inadmissible** testimony already presented to the jury during the trial; and 5) when considered in the context in which the testimony was introduced, and the relevance of the erroneously admitted testimony to the genuinely disputed issues at trial, there is no reasonable possibility that the hearsay testimony contributed to the jury's verdict.

As this court has long held (consistent with every court in Florida):

It is well settled that even incorrectly admitted evidence is deemed harmless and may not cause reversal when it is essentially the same as or merely corroborative of other properly considered testimony.

Clausell v. State, 548 So. 2d 889, 891 (Fla. 3d DCA 1989).

Because any error in the admission of this evidence was harmless beyond a reasonable doubt, and because the majority opinion injects uncertainty and inconsistency into an otherwise well-engrained area of the law, I respectfully dissent.

29

## II. The Inadmissible Testimony at Trial and the Closing Argument

The majority opinion sets forth the portion of the testimony by A.J. and Michael that was hearsay. However, what the majority fails to do is include the admissible evidence on the very same topic, introduced through these very same witnesses, as well as through Norma's husband, Jules. Since a proper harmless error analysis (especially one involving cumulative evidence) requires a review of both the admissible and inadmissible evidence, I include both aspects here.

### A. The Hearsay Testimony Relied Upon by the Majority Opinion

The testimony relied upon by the majority opinion for its reversal consists of a few lines of testimony from Norma's two sons, A.J. and Michael, and one sentence by Plaintiff's counsel during closing.

Specifically, Norma's son A.J. testified:

Q. After she had her lung removed, okay, did she ever express to you that she was upset?

. . .

A. Okay. Yeah. After her surgery, she was very upset at the tobacco companies specifically.

. . .

A. Because she was upset at **the tobacco companies because they told her that filtered cigarettes – that filters would filter out the bad stuff and keep her safe** and she knew once she got lung cancer and had her lung removed that the filter didn't keep her safe and didn't filter out the bad stuff.

30

(Emphasis added to highlight the objectionable portion raised by Philip Morris on appeal.)

Norma's other son, Michael, testified that after his mother was diagnosed with lung cancer, she told him why she was angry at the cigarette companies:

Q. Did she tell you why she was angry at the tobacco companies?

A. She said, "**They lied to me**." She said—

Defense counsel: Objection. Hearsay.

Court: Overruled.

A. So she was mad that she was dying. She said, "**Cigarette companies lied to me**. I wish I'd never smoked." And then she made me promise that I would never smoke.

(Emphasis added to highlight the objectionable portion raised by Philip Morris on appeal.)

Plaintiff's counsel later referred to the above testimony during closing arguments, telling the jury: "**She was angry when she found out that she was lied to. She believed them, that filters were going to keep her safe, that it was safer**." (Emphasis added.)

It is upon these two hearsay statements and this single comment by counsel in closing that the majority opinion reverses the jury's verdict. And although the testimony above is hearsay because of **when** Norma made

31

these statements to her sons (rather than what she said), <u>see</u> § 90.803(3)(b), Fla. Stat. (2021) (while statements are admissible to prove one's then-existing state of mind, "[a]n after-the-fact statement of memory or belief to prove the fact remembered or believed" is inadmissible), this hearsay testimony, in the context of the other testimony and evidence presented to the jury, was merely cumulative. This point is most clearly established by comparing it to the admissible testimony presented to the jury through Norma's two sons and her husband, Jules.

The evidentiary impediment to the admission of the above testimony is not ***what*** Norma said, but rather ***when*** Norma said it. Indeed, this temporal distinction is so nuanced that it serves as perhaps the best illustration of what can constitute harmless error based on the cumulative nature of the hearsay.

Norma's statements, as testified to by A.J. and Michael, were hearsay only because she made them *after* she had already quit smoking (or after she was diagnosed with lung cancer, discovering that Philip Morris had been lying about the safety of filtered cigarettes). Plaintiff had to establish at trial that Norma ***relied on*** Philip Morris' false advertising and misleading marketing ***to continue smoking*** the filtered cigarettes because they promoted them as "safe". Such detrimental reliance was a disputed issue at trial, and thus Norma's out-of-court statements were admissible to prove her

32

then-existing state of mind, but only at a point in time "when such a state is at issue in the action." § 90.803(3)(a)1, Fla. Stat. (2021). See also Lorillard Tobacco Co. v. Alexander, 123 So. 3d 67 (Fla. 3d DCA 2013) (holding statements made by decedent to his wife were admissible because the statements were made while decedent was still smoking, and evidenced his then-existing state of mind, rather than an after-the-fact recollection).

This particular fragment of testimony by A.J. and Michael was therefore hearsay, and it should have been excluded. And if this was the only evidence presented to the jury to prove Norma's state of mind—her reliance on the false and misleading advertising and marketing of Philip Morris to explain why she continued to smoke Philip Morris' cigarettes, I would be joining, rather than dissenting from, the majority opinion.

But the objected-to testimony was ***not*** the only evidence presented by Plaintiff to the jury on this issue of why Norma continued to smoke cigarettes. Indeed, several witnesses testified at trial that Norma told them—at a time when she was still smoking cigarettes—that the reason she was continuing to smoke was because she believed the filtered cigarettes were safer, and that her belief was based on what she had been told by the cigarette companies in their ads and marketing. Much of this testimony was indistinguishable from that described above; the difference is that Norma

33

made these admissible statements to explain why she was still smoking—i.e., in reliance on the advertising and marketing campaign about the safety of its filtered cigarettes. This testimony was not hearsay, and was properly admitted in order to establish Norma's "then-existing state of mind," see § 90.803(3)(b), Fla. Stat., rather than "[a]n after-the-fact statement of memory or belief to prove the fact remembered or believed . . . ." Id.

**B. The Admissible Testimony Properly Presented to the Jury**

*Admissible Testimony from Norma's Husband, Jules*

The most compelling testimony came from Norma's husband, Jules. He testified to statements Norma made to him—while she was still smoking— that she believed the magazine ads and articles which told her filtered cigarettes were safe and didn't cause cancer. This was the most direct evidence in the trial on the question of Norma's detrimental reliance on Philip Morris' fraudulent and misleading advertising and marketing of cigarettes. Here are the excerpts of Jules' properly-admitted trial testimony:

Q. Was she a person that would listen to scientists and doctors?
A. Yes.

Q. Back in the '70s and '80s, did she understand that the manufacturer of a product knew more about the safety of the product than anybody else?
A. I believe she did --

Q. Did she read the newspapers and other publications?

34

A. Yes.

Q. Watch TV?
A. Yes.

Q. The news?
A. Yes.

Q. ***Was Norma aware that there was a controversy about smoking and health?***
A. ***Yes.***

Q. What did she know?
A. Well, she believed -- she believed that what she read in the magazines or ***she showed me the articles showing that there was no proof that cigarette smoking caused cancer. And she also -- she would show me the advertisements showing that the filters in cigarettes would take out the bad stuff.***

Q. And did she believe that?
A. ***She absolutely believed that.***

Q. And how do you know that?
***A. Because she kept on smoking, and she – she would show me from time to time these articles showing that cigarette smoking would cause -- there was no proof that cigarette smoking caused cancer.***

Q. When you met her in 1969, she was smoking a Virginia Slim cigarette?
A. Correct.

Q. Was that a filtered cigarette?
A. Yes.

Q. So ***how were filters being advertised*** back then?
A. ***Well, they were advertised that the filters would take the bad stuff out of the cigarettes.***

35

Q. And did -- did tobacco companies disclose that information?
A. Not that I know of.

Q. Well, first of all, did she know -- let me back that up and ask it. ***Did she know that filtered cigarettes were just a gimmick?***
A. ***No.***

Q. ***Did she know that filtered cigarettes did not provide any safety***?
A. ***No.***

Q. ***And did she know that filters did not take out any of the bad stuff?***
A. ***No.***

Q. All right. Did the tobacco companies disclose that information to her?
A. No.

Q. ***Now, did you believe that filtered cigarettes actually provided some sort of safety?***
A. ***I believe what she showed me and – whatever she showed me, I did not have -- I had no reason not to believe.***

Q. When did Norma -- you know, when did she come to the realization that filters -- you know, the cigarettes with filters on it did not work?
A. When she was diagnosed with cancer.

*Admissible Testimony from Norma's Sons, A.J. and Michael*

In addition, Norma's two sons, A.J. and Michael—the very same witnesses whose hearsay testimony the majority opinion relies upon for its reversal—provided admissible testimony that Norma, <u>while still smoking</u>

36

cigarettes, told each of them she was continuing to smoke because she believed that the filtered cigarettes she was smoking were safer.

● **A.J.'s Testimony**

A.J. testified that he asked his mother about this after he heard in high school that smoking could be bad for her:

> Q. And what did she say in response to that?
>
> A. When I told her, she said, AJ, I only smoke cigarettes that have filters.
> . . .
> Q. After you expressed to your mother that smoking was bad, did she express to you _**why she was continuing to smoke?**_
> . . .
> A. Yes. Yes.
> . . .
> A. Yes. She said that _**she continued to smoke because she only smoked cigarettes that had filters**_, and she makes sure that she – that she only smokes filtered cigarettes, _**and that the filters will filter out the bad stuff and keep her safe.**_

In addition, A.J. testified that he knew his mom continued smoking even after lung surgery because she told him. He can "never be sure" if she ever quit but he would "bet that she didn't because the urges were always too great" for her.[7]

---

[7] This last portion of A.J.'s testimony was relevant and admissible to counter Philip Morris' other central argument at trial: that Norma was not addicted to cigarettes and could have quit at any time. See discussion *infra* at *47-48.

37

● **Michael's Testimony**

Michael testified that his mother told him he didn't need to worry that she was continuing to smoke cigarettes because she believed filtered cigarettes were safe.

> Q. I said, did you ever have any conversations with your mom where she expressed to you her thoughts, her impressions, **what she believed about the filtered cigarettes that she was smoking at that time and** *why she was continuing to smoke*?
> A. Yes. I mean, she would say all the time, she would tell me – like, we'd just be talking, and ***obviously she was smoking***, and she would just tell me not to worry. She'd say, "***Don't worry. You know, I smoke filtered cigarettes, they're safe.***" That was something that she'd say. I didn't really think much about it at the time. But it's just something she said.
>
> Q. And is this just one conversation you had with your mom about this?
> A. No. I was with my mom all the time. It's just something she said.
>
> Q. Did you believe that she was sincere about what she was telling you?
> A. Of course.

## III.    The Harmless Error Test

The  jury's verdict in a civil action should be affirmed on appeal where the admission of testimony, though erroneous, constitutes harmless error. Special v. West Boca Medical Center, 160 So. 3d 1251 (Fla. 2014).  Although the harmless error test was first applied to criminal appeals, see State v. DiGuilio, 491 So. 2d 1129, 1139 (Fla. 1986) (applying the harmless error rule

38

to affirm a criminal conviction for conspiracy to traffic in cocaine, notwithstanding the prosecution's improper questioning and elicitation of testimony regarding the defendant's invocation of his right to remain silent during police questioning), in 2014, the Florida Supreme Court adopted the DiGuilio harmless error test for civil appeals as well:

> Although the test for harmless error as stated in *DiGuilio* applies to criminal appeals, we conclude that this test, with slight modification to accommodate the civil context, is also the appropriate test for harmless error in civil appeals. Thus, today, we announce the following test for determining harmless error in civil appeals:
>
> > To test for harmless error, the beneficiary of the error has the burden to prove that the error complained of did not contribute to the verdict. Alternatively stated, the beneficiary of the error must prove that there is no reasonable possibility that the error contributed to the verdict.

Special, 160 So. 3d at 1256.

The harmless error test is applicable even to errors of a constitutional magnitude,[8] and, in the criminal context, the test is intended to "preserve[]

---

[8] See, e.g., State v. DiGuilio, 491 So. 2d 1129, 1134 (Fla. 1986) (noting that "constitutional errors, with rare exceptions, are subject to harmless error analysis," and applying the harmless error rule to affirm a criminal conviction for conspiracy to traffic in cocaine, notwithstanding the prosecution's improper questioning and elicitation of testimony regarding the defendant's invocation of his right to remain silent during police questioning); Goodwin v. State, 751 So. 2d 537, 540 (Fla. 1999) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was

the accused's constitutional right to a fair trial by requiring the state to show beyond a reasonable doubt that the specific comment(s) did not contribute to the verdict. At the same time, it preserves the public and state interest in finality of verdicts which are free of any harmful error." DiGuilio, 491 So. 2d at 1136. The same can be said when applying the harmless error rule on appellate review of verdicts in civil cases. As the Court noted in Special, 160 So. 3d at 1257:

> The no reasonable possibility test also strikes the appropriate balance between the need for finality and the integrity of the judicial process. The test recognizes that not all errors have a reasonable possibility of contributing to the verdict, but the test affords relief on account of errors that do. Further, the application of the no reasonable possibility test for harmless error will foster consistency in appellate courts' analyses of harmless error.

## IV.    Factors to Consider in Assessing Harmless Error

In applying the harmless error test, we must consider the entire record, not in a vacuum, but in the context in which the testimony was presented to the jury. We must also consider whether the erroneously admitted testimony is cumulative to other evidence properly presented, and the relevance of the erroneously admitted testimony to the disputed issues at trial. See, e.g., Special, 160 So. 3d at 1256 ("[A]pplication of [this] test requires an

---

harmless beyond a reasonable doubt") (quoting Chapman v. California, 386 U.S. 18, 24 (1967)).

40

examination of the entire record by the appellate court including a close examination of the permissible evidence on which the jury could have legitimately relied, and in addition an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict.") (quoting DiGuilio, 491 So. 2d at 1135).

Although the majority opinion suggests otherwise, it is clear in this case that the erroneously admitted evidence is merely cumulative to the other substantial testimony and evidence introduced at trial, and could not reasonably have had any impact on the disputed issues at trial.[9]  Under such circumstances, we must affirm.  See, e.g., Sutton v. State, 909 So. 2d 292 (Fla. 3d DCA 2004) (affirming murder conviction and holding that trial court's errors—admitting hearsay testimony regarding defendant's change in appearance shortly following the murder, and then permitting prosecutor to argue in closing that this improper testimony evidenced defendant's consciousness of guilt—was harmless error, in light of the fact it was

_____

[9] Although the majority opinion cites R.J. Reynolds Tobacco Co. v. Hamilton, 316 So. 3d 338 (Fla. 4th DCA 2021) in support of its conclusion that the error was not harmless because the evidentiary value of the hearsay testimony to prove Mrs. Lipp's reliance on Philip Morris's lies was "significant," see Maj. Op. at *13, the majority opinion ignores the fact that, unlike Hamilton, in the instant case there was substantial cumulative and admissible evidence that Mrs. Lipp relied on Philip Morris' lies and, upon that reliance, continued smoking. See discussion infra at *63-64.

cumulative to other testimony regarding defendant's change in appearance, other evidence of consciousness of guilt, and given that defendant's main defense was alibi); Andrews v. Tew By and Through Tew, 512 So. 2d 276 (Fla. 2d DCA 1987) (reversing order granting new trial, and holding that, even if admission of the expert's testimony was error, the error was harmless given that it was "merely cumulative" of other testimony presented during the trial); Rodgers v. State, 948 So. 2d 655 (Fla. 2006) (affirming sentence of death for first-degree murder, and holding that trial court's violation of defendant's constitutional right of confrontation under Crawford v. Washington, 541 U.S. 36 (2004), was harmless, given that the evidence erroneously admitted was merely cumulative to, and corroborative of, other evidence admitted at trial); Kaczmar v. State, 104 So. 3d 990 (Fla. 2012) (affirming first-degree murder conviction and sentence of death, and holding that violation of spousal privilege—by which trial court permitted defendant's wife to testify to communications in which the defendant asked her to get $300 to use in framing defendant's friend for the murder—was harmless beyond a reasonable doubt because this improperly admitted testimony was merely cumulative to other admissible testimony by the wife, relating to her own actions as opposed to communications with the defendant).

## V. **Providing Proper Context for Applying the Harmless Error Analysis: The Preclusive Engle Findings, the Undisputed Facts, and the Remaining Issues in Dispute**

### A. *The Preclusive Engle Findings and Stipulated Facts*

It is worth remembering that the trial in this case lasted fifteen days, resulting in a transcript of more than 3,600 pages.[10]  In addition, once Plaintiff established (and, as the jury found) that Norma was a member of the Engle class,[11] Plaintiff was entitled to rely on, **and the jury was required to accept**, certain preclusive Engle findings. As such, the trial court delivered the following instructions to the jury:

> If you find that Norma Lipp was a member of the Engle class, the following Engle findings **must be applied** in this case.
>
> ► Smoking cigarettes causes lung cancer.
>
> ► Nicotine in cigarettes is addictive.
>
> ► Philip Morris placed cigarettes on the market that were defective and unreasonably dangerous.
>
> ► Philip Morris was negligent.

---

[10] In fact, this was the second trial of the case, the first resulting in a mistrial due to the COVID-19 pandemic. Thus, a reversal of the jury verdict in this case means the Lipp family must endure a third trial in the case against Philip Morris for the death of their wife and mother, a death Philip Morris acknowledges was medically caused by her smoking the company's product.

[11] As the trial court instructed the jury, in order to establish Norma Lipp was a member of the Engle class, Plaintiff had to prove "prove by the greater weight of the evidence that Norma Lipp was addicted to cigarettes containing nicotine and, if so, that such addiction was a legal cause of her lung cancer and death." See Engle v. Liggett Grp., Inc., 945 So. 2d 1246 (Fla. 2006).

► *Philip Morris concealed or omitted material information not otherwise known or available, knowing that the material was false and misleading, or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes, or both.*

► *Philip Morris entered into an agreement to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment.*

(Emphasis added).  See also Alexander, 123 So. 3d at 72 (setting forth the preclusive findings for an Engle class plaintiff).

The judge instructed the jurors that they could not deny or question these findings, and that these findings carry the same weight as if the jurors had reached these determinations on their own.

Additionally, the parties stipulated to certain facts, thereby further narrowing the disputed issues at trial.  For example, the jury was instructed:

Members of the jury, the parties have agreed to certain facts. You must accept these facts as true. There is no dispute that the decedent, Norma Lipp, had lung cancer. ***There is no dispute in this case that the cigarettes Ms. Lipp smoked, including the cigarettes manufactured by Philip Morris USA Incorporated, were the medical cause of her lung cancer and death.***

(Emphasis added.)

These findings, which the jury was ***required to accept*** once they determined Norma Lipp was a member of the Engle class, are extraordinary indeed.  In effect, the trial court instructed the jurors that if they found by their

44

verdict that Norma was a member of the <u>Engle</u> class (which the jury did in fact find) they must then accept, as a proven fact, ***that Philip Morris lied to people who smoked Philip Morris cigarettes, and entered into an agreement with others to lie to people who smoked Philip Morris cigarettes, with the intent that smokers (and the general public) would rely upon these lies.***

B. <u>*The Undisputed Facts*</u>

As a result of the jury finding Norma Lipp was an <u>Engle</u> class member, the following issues were ***undisputed***, and as a reviewing court, we must consider this context in evaluating the "harmfulness" of the inadmissible testimony relied upon by the majority to reverse this 15-day trial:

1) Norma Lipp smoked cigarettes manufactured by Philip Morris;

2) Philip Morris' cigarettes were the medical cause of Norma's lung cancer and death;

3) Philip Morris lied to consumers who smoked Philip Morris' cigarettes;

4) Philip Morris lied about the addictive nature and health effects of its cigarettes;

5) Philip Morris entered an agreement with others to lie about the addictive nature and health effects of its cigarettes;

6) Philip Morris and others entered this agreement to lie with the intent that smokers and the general public would rely upon these lies.

C. <u>*The Remaining Issues in Dispute*</u>

45

In light of these preclusive findings which a jury must accept as proven fact, one might reasonably ask "What is left to prove at the trial?" For our purposes, and for purposes of analyzing and applying the harmless error test through the lens of an Engle progeny case, what was primarily disputed at trial was 1) whether Norma was addicted to cigarettes and 2) whether Norma relied upon the false and misleading advertising and marketing of Philip Morris to continue to smoke its cigarettes.

While the jury was required to accept—as a preclusive finding under Engle– that Philip Morris intended that smokers would rely upon its false and misleading advertising, Plaintiff had to establish, by a preponderance of the evidence, that Norma relied to her detriment upon Philip Morris' false and misleading advertising about the health effects and addictive nature of its cigarettes (particularly that filtered cigarettes were "safe" to smoke), such that Norma continued to smoke.

In other words (and contrary to the majority opinion's overstatement), it was hardly in dispute that Philip Morris "lied" to Norma. This was established (in large part) by the preclusive findings that Philip Morris lied to smokers, and entered an agreement with others to lie to smokers (and to the general public) about the adverse health effects of smoking Philip Morris' cigarettes. While Plaintiff indeed had to prove that Norma, through exposure

46

to its advertising and marketing, relied on Philip Morris' lies, the initial aspect of this proof (i.e., that Philip Morris "lied" to smokers about the adverse health effects of smoking its cigarettes) was established beyond peradventure. It is in this context that we must measure the ostensible harmfulness of the snippet of testimony relied upon by the majority for its reversal.

Philip Morris contended that during the time Norma smoked, there was substantial information in the public domain regarding the dangers and adverse health effects of cigarette smoking, that Norma was not addicted to cigarettes, could have stopped smoking at any time, and that Norma chose to continue smoking cigarettes *not* in reliance on Philip Morris' assurances of safety, but rather in spite of the publicly available information on the dangers, hazards and adverse health effects of smoking. Thus, whether Norma was addicted to cigarettes and whether she continued smoking cigarettes in reliance on Philip Morris' false and misleading advertising claims that cigarettes are safe were the central disputed facts at trial. Counsel for Philip Morris described them to the jury in opening statement:

**Addiction**[12]

---

[12] As the trial court instructed the jury at the end of the case, in order to be entitled to the preclusive findings discussed supra at *43-44, Plaintiff was first required to prove that Norma Lipp was a member of the Engle class. In making this determination, the jury had to consider whether Plaintiff proved

47

"And she was informed. She understood the dangers of cigarette smoking. Remember the bad stuff that she spoke to Mr. Lipp about in 1969? And that she made a choice to continue to smoke despite being aware of the danger."

"This case is about Norma Lipp and her smoking decision . . . and about whether and when she decided to quit."

"The testimony about whether Mrs. Lipp was addicted or not, whether she was powerless to quit smoking, is going to be inconsistent."

"Mrs. Lipp was capable of quitting smoking, if that's what she wanted to do."

### Detrimental reliance

"The credible evidence in this case will be that Mrs. Lipp, like the majority of the informed public, understood that there was bad stuff in cigarettes and it was a threat to her health, and she made the decision to keep smoking despite knowing those risks. . . .

And she was informed. She understood the dangers of cigarette smoking. . . . And that she made a choice to continue to smoke despite being aware of the danger.

"No one forced Mrs. Lipp into smoking throughout her life. It was her decision and only one that she could make."

"They have to prove to you that Mrs. Lipp actually and reasonably relied upon the things that Dr. Proctor [Plaintiff's expert] is going to tell you about."

## VI.    Analysis of Harmful Error

---

that "Norma Lipp was addicted to cigarettes containing nicotine and, if so, that such addiction was a legal cause of her lung cancer and death."

In its brief on appeal, Philip Morris did not raise any evidentiary or legal issue regarding Plaintiff's proof of Norma's addiction. However, it is discussed here because it remains relevant and explains why some aspects of the statements at issue were admissible and properly considered by the jury.

48

This backdrop provides the necessary context for our analysis. Plaintiff pursued a theory that Philip Morris' campaign of false and misleading advertising and marketing constituted fraudulent concealment, and that it conspired to engage in fraudulent concealment. By proving (among other things) that Norma was addicted to cigarettes containing nicotine, she would be a member of the Engle class, and entitled to rely upon the preclusive findings, including that Philip Morris concealed or omitted material information, knowing it was false and misleading, concerning the health effects or addictive nature of smoking cigarettes; and that Philip Morris entered into an agreement to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment. Even with these preclusive findings, Plaintiff was still required to establish that Norma continued smoking in reliance on Philip Morris' (and other's) campaign of false and misleading advertising and marketing.

As we recently observed, "an Engle plaintiff must present direct evidence that the smoker specifically relied on a tobacco company's statement, or a category of statements, to support an alleged concealment claim against an Engle defendant (or a co-conspirator for an alleged conspiracy claim), and that the statement(s) relied upon concealed or

49

omitted material information about the health effects or addictiveness of smoking cigarettes." <u>Philip Morris USA, Inc., v. Chadwell</u>, 404 So. 3d 460, 464 (Fla. 3d DCA 2024) (quoting <u>Prentice v. R.J. Reynolds Tobacco Co.</u>, 338 So. 3d 831, 838 (Fla. 2022)).

In <u>Prentice</u>, 338 So. 3d at 840, the Florida Supreme Court further explained:

> For the reliance element of the fraudulent concealment claims, the <u>Engle</u> progeny plaintiff's burden is to prove that the defendant's fraudulent conduct—as defined in <u>Engle</u>—caused the plaintiff to form a false belief about the health effects or addictiveness of smoking cigarettes and then to act to his detriment. And as we have explained, as to fraudulent concealment, the <u>Engle</u> defendants perpetrated their fraud through incomplete statements.
> The only way for an <u>Engle</u> progeny plaintiff to prove reliance (and therefore causation) is to show that he received, believed, and acted upon the statements that omitted the material information.
> Evidence of reliance may consist of a plaintiff's statements to others

regarding her then-existing state of mind. For example:

> Husband testifies his plaintiff/wife told him, **while she was still smoking**: "I'm still smoking these cigarettes because they are safe. I've seen their commercials and read the magazine ads by the tobacco company, and they tell us cigarettes with filters are safe."

This would be **admissible** under section 90.803(3)(a), as a present sense impression:

> **(3) Then-existing mental, emotional, or physical condition.--**
> (a) A statement of the declarant's then-existing state of mind, emotion, or physical sensation, including a statement of intent,

plan, motive, design, mental feeling, pain, or bodily health, **when such evidence is offered to**:
> 1. **Prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when such state is an issue in the action**.
> 2. **Prove or explain acts of subsequent conduct of the declarant.**

(b) **However**, this subsection **does not make admissible**:
> 1. **An after-the-fact statement of memory or belief to prove the fact remembered or believed**, unless such statement relates to the execution, revocation, identification, or terms of the declarant's will.
> (Emphasis added in italics).

Under either (3)(a)1. or 2. above, the statement made by plaintiff about why she is **<u>continuing</u>** to smoke cigarettes is admissible to prove her then-existing state of mind at a time when that state of mind is relevant (i.e., at a time she is still smoking), and to prove or explain her subsequent conduct (i.e., why she is continuing to smoke cigarettes).

By contrast, evidence in the form of a statement made by a plaintiff after she had already quit smoking—where she is recalling an <u>earlier</u> state of mind—is generally inadmissible hearsay: this is an <u>after-the-fact</u> recollection rather than a present-sense impression.  For example:

> Husband testifies his wife/plaintiff told him, **<u>a year after she quit smoking</u>**: "I was still smoking these cigarettes because they were safe.  I'd seen their commercials and read the magazine ads by the tobacco company, and they told us cigarettes with filters were safe."

51

As can be seen, the two above examples made by the wife/plaintiff to her husband are nearly identical. The difference is the _temporal_ element: when (in relation to her smoking) did she make those out-of-court statements—while she was still smoking cigarettes, or after she quit. Given the near-identical versions, the nuanced nature of this distinction must be kept in mind when assessing the relative harmful or harmless nature of the admission of such testimony, especially when both versions are presented to the jury.

At trial, Plaintiff presented substantial and largely unrebutted evidence that Philip Morris engaged in a campaign of false advertising and marketing to make smokers believe cigarettes weren't injurious to their health, and that the production and sale of filtered cigarettes was a part of the plan to reassure smokers by misleading them into believing that filtered cigarettes would be cleaner and safer.

Plaintiff provided expert testimony and other evidence that, in fact, filtered cigarettes were no safer than unfiltered cigarettes,[13] that Philip Morris knew this **from its own research**, but nevertheless told smokers and the general public that filtered cigarettes were safer.

---

[13] Dr. Proctor testified at trial that the illusion that filtered cigarettes are safer is "entirely fake. . . . They're not even filters . . . in any sense of the word. . . [and] cancer rates kept going up even after filters."

52

Plaintiff's expert, Dr. Proctor, testified that Philip Morris knew smokers were switching to filtered cigarettes because they thought they were safe—that this was in fact the entire point of marketing filtered cigarettes beginning in 1954 (a scientific turning point because the fact that cigarettes caused cancer was coming out at this time and there was a correlative drop in sales). In addition:

Dr. Proctor gave specific examples culled from Philip Morris documents, including an internal memo that specifically showed Philip Morris "knew that the so-called high filtration cigarettes were no different." He testified: "they knew that filters were bogus . . . . They knew that the smoke that comes out of a so-called filter is the same – essentially, the same and there is no difference. That is why the death rate didn't go down when filters were introduced." He discussed at length this "gimmick" of filters invented by cigarette companies to convince consumers filters were a cleaner, safer form of smoke.

Dr. Proctor testified that Philip Morris' head of research, in a 1961 internal document, reported that "present technology does not permit selective filtration of particulate smoke."

Dr. Proctor testified: "Publicly, they are saying it can be filtered. You know, filters are an improvement. They imply they are safer." He also testified

that "None of them were filtered, but they claimed to have a filter, when, of course, they did not."

Nevertheless, in a letter to the United States Surgeon General two years later (1963), Philip Morris reported that cigarettes were not dangerous and also, that "it is possible, of course, to modify the chemical composition of cigarette smoke by the use of filters."

Dr. Proctor testified that in 1970 "almost everyone thought filters were safer. It is a ploy – the whole idea – how could a filter not be safer, right? Isn't filtered water safer than non-filtered? When you buy an air filter, doesn't it mean you are cleaning the air? What would it mean to have a filter on a cigarette unless it meant cleaner, safer? That is what the word means. That is why the fraud is built into the word."

Keeping this context in mind as we review and compare the hearsay testimony in this case with the admissible testimony presented to the jury on the very same issues in dispute during this fifteen-day trial, it is plain that harmful error did not occur here.

**<u>A.J.'s Hearsay Testimony</u>**

A.J. testified:

> Q. After she had her lung removed, okay, did she ever express to you that she was upset?
> . . .

A. Okay. Yeah. After her surgery, she was very upset at the tobacco companies specifically.

. . .

A. Because she was upset at **the tobacco companies because they told her that filtered cigarettes – that filters would filter out the bad stuff and keep her safe** and she knew once she got lung cancer and had her lung removed that the filter didn't keep her safe and didn't filter out the bad stuff.

(Emphasis added to highlight the objectionable portion raised by Philip Morris on appeal).

### A.J.'s Admissible Testimony

But A.J. also testified to the jury, properly and without objection about conversations he had with his mom when she was still smoking cigarettes and he heard at school that smoking could be bad for you:

Q. And what did she say in response to that?

A. When I told her, she said, AJ, I only smoke cigarettes that have filters.
. . .
Q. After you expressed to your mother that smoking was bad, did she express to you *why she was continuing to smoke?*
. . .
A. Yes. Yes.

. . .

A. Yes. She said that *she continued to smoke because she only smoked cigarettes that had filters*, and she makes sure that she – that she only smokes filtered cigarettes, *and that the*

55

***filters will filter out the bad stuff and keep her safe.***

(Emphasis added).

### Michael's Hearsay Testimony

Michael testified that after his mother was diagnosed with lung cancer, she told him why she was angry at the cigarette companies:

> Q. Did she tell you why she was angry at the tobacco companies?
>
> A. She said, "**They lied to me**." She said—
>
> Defense counsel: Objection. Hearsay.
>
> Court: Overruled.
>
> A. So she was mad that she was dying. She said, "**Cigarette companies lied to me**. I wish I'd never smoked." And then she made me promise that I would never smoke.

(Emphasis added to highlight the objectionable portion raised by Philip Morris on appeal).

### Michael's Admissible Testimony

But Michael also testified that his mother told him not to worry that she was continuing to smoke cigarettes because she believed filtered cigarettes were safe:

> Q. I said, did you ever have any conversations with your mom where she expressed to you her thoughts, her impressions, **what she believed about the**

56

**filtered cigarettes that she was smoking at that time and *why she was continuing to smoke*?**

A. Yes. I mean, she would say all the time, she would tell me – like, we'd just be talking, and *obviously she was smoking*, and she would just tell me not to worry. She'd say, "*Don't worry. You know, I smoke filtered cigarettes, they're safe.*" That was something that she'd say. I didn't really think much about it at the time. But it's just something she said.

Q. And is this just one conversation you had with your mom about this?

A. No. I was with my mom all the time. It's just something she said.

Q. Did you believe that she was sincere about what she was telling you?

A. Of course.

(Emphasis added).

Presenting these excerpts side-by-side, it is clear the inadmissible portions are merely cumulative to the admissible, relevant and substantial testimony presented to the jury on the same disputed issue.

## Jules' Admissible Testimony

In addition, the most compelling testimony on this disputed issue of detrimental reliance came from Norma's husband, Jules. He testified to statements Norma made to him—*while she was still smoking*— that she believed the magazine ads and articles which told her filtered cigarettes were

57

safe and didn't cause cancer. This was the most direct evidence in the trial on the question of Norma's detrimental reliance on Philip Morris' fraudulent and misleading advertising and marketing of cigarettes. Here are the excerpts of Jules' properly-admitted trial testimony:

Q. Was she a person that would listen to scientists and doctors?
A. Yes.

Q. Back in the '70s and '80s, did she understand that the manufacturer of a product knew more about the safety of the product than anybody else?
A. I believe she did --

Q. Did she read the newspapers and other publications?
A. Yes.

Q. Watch TV?
A. Yes.

Q. The news?
A. Yes.

Q. ***Was Norma aware that there was a controversy about smoking and health?***
A. ***Yes.***

Q. What did she know?
A. Well, she believed -- she believed that what she read in the magazines or ***she showed me the articles showing that there was no proof that cigarette smoking caused cancer. And she also -- she would show me the advertisements showing that the filters in cigarettes would take out the bad stuff.***

Q. And did she believe that?
A. ***She absolutely believed that.***

58

Q. And how do you know that?

A. **_Because she kept on smoking, and she – she would show me from time to time these articles showing that cigarette smoking would cause -- there was no proof that cigarette smoking caused cancer._**

Q. When you met her in 1969, she was smoking a Virginia Slim cigarette?

A. Correct.

Q. Was that a filtered cigarette?

A. Yes.

Q. So **_how were filters being advertised_** back then?

A. **_Well, they were advertised that the filters would take the bad stuff out of the cigarettes._**

Q. And did -- did tobacco companies disclose that information?

A. Not that I know of.

Q. Well, first of all, did she know -- let me back that up and ask it. **_Did she know that filtered cigarettes were just a gimmick?_**

A. **_No._**

Q. **_Did she know that filtered cigarettes did not provide any safety_**?

A. **_No._**

Q. **_And did she know that filters did not take out any of the bad stuff?_**

A. **_No._**

Q. All right. Did the tobacco companies disclose that information to her?

A. No.

Q. **_Now, did you believe that filtered cigarettes actually provided some sort of safety?_**

59

A. _**I believe what she showed me and – whatever she showed me, I did not have -- I had no reason not to believe.**_

Q. When did Norma -- you know, when did she come to the realization that filters -- you know, the cigarettes with filters on it did not work?
A. When she was diagnosed with cancer.

(Emphasis added).

Plaintiff's addiction expert, Dr. Toll, also testified (consistent with Jules' testimony above) regarding Norma's statements of detrimental reliance on Philip Morris' marketing and advertising. Dr. Toll testified that, based upon his review of the record, Norma showed her husband articles about how the filters took all the bad stuff and that "all of the family members testified that when they expressed concern to her about her smoking, that her smoking might cause her illness, she said, don't worry. The filters take out all of the bad stuff from cigarettes."

This properly presented testimony of A.J., Michael, Jules and Dr. Toll, together with the preclusive Engle findings, the pretrial stipulations, and the substantial expert testimony presented by Plaintiff to show Philip Morris misled and deceived smokers and the general public about the safety of filtered cigarettes, rendered the fragments of inadmissible hearsay, relied upon by the majority for reversal, merely cumulative, and any error harmless.

60

This admissible testimony also renders inapposite the singular case relied upon by the majority opinion: the Fourth District's decision in R.J. Reynolds Tobacco Co. v. Hamilton, 316 So. 3d 338 (Fla. 4th DCA 2021). In Hamilton, the hearsay statements erroneously admitted were **not** cumulative to other evidence presented to the jury. In fact, ***there were <u>no</u> admissible, non-hearsay statements*** made by Mrs. Hamilton regarding her state of mind while she was still smoking, thus nothing to compare to the inadmissible statements erroneously presented to the jury.

The Hamilton court found that the singular statement introduced at trial "was made within the context of Mrs. Hamilton telling [her son] to smoke filtered cigarettes in the future. In other words, Mrs. Hamilton's statement to [her son] that she heard filtered cigarettes were safe from the advertising was not a statement of why Mrs. Hamilton continued to smoke filtered cigarettes at the time she had the conversation with [her son]." Id. at 341.

In the absence of any admissible direct evidence upon which the jury could rely to find detrimental reliance, the Fourth District concluded "[i]t cannot be said the error was harmless." Id. at 342. The court explained its reasoning:

> In order for Plaintiff to prevail on his conspiracy to commit fraud by concealment claim, he was required to prove that Mrs. Hamilton detrimentally relied on an act or statement made in furtherance of RJR's agreement to conceal or omit material

61

information concerning the health effects or addictive nature of cigarettes. Mrs. Hamilton's statement that filtered cigarettes were safe based on what she heard from advertising, in turn, was undoubtedly the strongest evidence of reliance in this case. Plaintiff's counsel all but acknowledged as much when arguing in favor of the statement's admission at trial, telling the court that, without the statement, RJR is "going to move for directed verdict if I don't—if I don't get this testimony."

Id.

Hamilton is thus inapplicable, because the hearsay testimony was the *only* direct evidence offered on the issue of detrimental reliance; there was no other evidence to render the erroneously-admitted hearsay cumulative.[14] In contrast, in the instant case there was substantial admissible testimony presented by several witnesses that Norma said—at a time when she continued smoking—that she did so because she believed filtered cigarettes were safe based upon the tobacco companies' advertising and articles.

Further, the majority opinion notes that "PM USA properly distinguishes" a case from this court, Alexander, 123 So. 3d at 67, because

---

[14] The plaintiff in Hamilton, 316 So. 3d at 342, argued that any error in admitting the hearsay testimony of the decedent was harmless because there was other evidence of her reliance based on her son's testimony that she had watched a news program where a tobacco industry representative denied any link between smoking and disease. The Fourth District rejected this argument, finding that although circumstantial evidence can establish reliance, "considering the strong evidentiary value of Mrs. Hamilton's statement, it cannot be said there is no reasonable possibility that the error contributed to the verdict." Id. at 342-43. In the instant case, admissible testimony was introduced that directly established Mrs. Lipp herself relied on Philip Morris's lies.

62

in Alexander, the decedent told his wife, while he was still smoking, that he believed filtered cigarettes were safe and did not believe the tobacco companies would make a product that would kill people. See Maj. Op. at *7, 9. The Alexander court held that because the decedent's statements were made to show his state of mind at the time, rather than after the fact, they were admissible. Id. at 75. What the majority opinion fails to recognize, in analyzing the issue of harmlessness in this case, is that the Alexander statements are precisely the type of admissible statements presented to the jury in this case, rendering the inadmissible statements merely cumulative.

Instead, the majority opinion pays short shrift to the harmlessness inquiry, noting that "[e]ven if some of the information conveyed by the hearsay statements is cumulative to other testimony," the inadmissible hearsay testimony was "perhaps more credible than the properly admitted evidence on the same issues," and "may ring less true to a jury that she would offer nearly spontaneous professions of faith in those lies to her family before the lies are exposed and before her cancer diagnosis and surgery." See Maj. Op. at *13-14. But the majority's supposition that the inadmissible testimony was "perhaps more credible" is 1) without foundation and 2) ignores the requirement that there be a "reasonable possibility" that the error contributed to the verdict. If a reviewing court can reverse upon the

63

speculation that the erroneously admitted testimony is "perhaps more credible" than the properly admitted evidence (even when the testimony is provided by the very same witnesses), the harmless error rule is reduced to mere caprice.

Moreover, the premise of the majority's position is factually incorrect and analytically flawed. Its premise is that it is not credible for Norma to have "offer[ed] nearly-spontaneous professions of faith in those lies to her family…." See Maj. Op. at *14. The testimony itself makes it very clear, repeatedly, that Norma had "ongoing" conversations with her husband and sons about why she was continuing to smoke. These were not (as the majority appears to characterize them) "out of the blue" statements by Norma. Instead, these were actual discussions between husband and wife, between mother and son, about why she was still smoking cigarettes. It defies the record to suggest otherwise. Indeed, these conversations, occurring while Norma was still smoking, make the most logical and compelling sense—and would seemingly be the more credible and reliable statements.

Relatedly, the majority's conclusion that the then-existing state of mind statements are somehow less credible flies in the face of the Evidence Code, section 90.803(3), which recognizes the state of mind exception as one of

64

those "firmly rooted" exceptions to the hearsay rule in this country. <u>Horton v. Allen</u>, 370 F. 3d 75, 85 (1st Cir. 2004) (quoting <u>Lilly v. Virginia</u>, 527 U.S. 116, 127 (1999)) (stating that firmly rooted exceptions are those that permit the admission of declarations "made without motive to reflect on the legal consequences of one's statements and in situations that are exceptionally conducive to veracity"). One of the reasons such statements are admissible as a hearsay exception is their underlying indicia of reliability, describing the declarant's ***then-existing*** state of mind, rather than a later recollection of a past state of mind, which is arguably subject to the foibles of memory or modification with the passage of time.

Given this level of reliability and trustworthiness, the admissible statements by Norma to her husband and sons, regarding her then existing state of mind (i.e., that she was continuing to smoke because tobacco companies advertised and marketed their filtered cigarettes as safe), were certainly more credible and more reliable than her later recollections of why she had kept smoking. The majority's contrary conclusion is but a strawman to find harmful error where it is clear only harmless error exists.

This ignores the point of the testimony at issue here: to establish that Norma believed filtered cigarettes were safe, was told so by the cigarette

companies, and continued to smoke as a result (i.e., she relied to her detriment on Philip Morris' own deceptive advertising and marketing).

In addition, the majority opinion posits that "[t]he hearsay statements also had a different narrative resonance" because they invoked "emotionally charged imagery" from a time when Norma was dying and on a last family vacation. See Maj. Op. at *14. There are at least four aspects of this that are misguided or incorrect.

First, the majority's suggestion of "emotionally charged imagery" conjures a false allusion to some deathbed scene that is simply not the case here. Yes, the erroneously admitted hearsay statements were made after Norma had been diagnosed with lung cancer and had a lung removed. But the family's trip to California—and the testimony of Jules, A.J. and Michael regarding the events surrounding Norma's injury, diagnosis, surgery and death—were admissible and relevant in this wrongful death action. As the trial court instructed, the damages to be considered by the jury included:

- "The loss by Jules Lipp of Norma Lipp's companionship and protection, and his pain and suffering as a result of Norma Lipp's injury and death from the date of injury."

- "The loss by Michael Jordan Lipp, A.J. Lipp, and Tracie Brooke Lipp Hirsch of parental companionship, instruction, and guidance, and their

66

pain and suffering as a result of Norma Lipp's injury and death from the date of injury."

It is telling that Philip Morris did not object to the trial testimony surrounding the family's trip to California, and for good reason—it was not an emotional appeal to the jury as seemingly characterized by the majority opinion. Plaintiff was entitled to present this testimony and evidence to the jury regardless of whether the accompanying hearsay statements had been introduced. It's also telling that Philip Morris did not raise any objection in closing argument (other than hearsay) during the Plaintiff's discussion of this testimony.[15]

In fact, there were many other moments introduced at trial, and discussed in Plaintiff's closing argument, that could be said to tug at one's heartstrings, but yet were (just as the California trip) completely proper and relevant for the jury to consider in assessing the award of damages. As just one example, Plaintiff's counsel referenced the following testimony in addressing the magnitude of loss suffered by Jules and the three children when losing their mom to lung cancer:

> Their loss is inconceivable, but what is more inconceivable is how these four people put their lives together and how they lived it with their mom. I mean, we showed you the love that they had

---

[15] Nor did Philip Morris raise this issue in its motion for new trial or motion to set aside the verdict and judgment.

for each other, the love that A.J. had for his—for his mother, how hard it was at 18 years old to stand in front of your family and friends and read the eulogy at your mother's funeral. And he did it again for you here. Michael, who had just turned 16, adored his mother. I mean, how many kids write poems to his mother on Valentine's Day or on Mother's Day, expressing his love? Tracie, the baby, she's [now] a mom. She's got two kids. There's a bond between mother and daughter that is special that can't be described in words.

This testimony and closing argument were presented to the jury without any objection, and any objection would have been properly overruled in any event. In proper context, the majority's attempt to cast the closing argument as an improper emotional one simply defies the record, the nature of this wrongful death action, and the evidentiary rules that permit such relevant testimony and argument. Indeed, this leads us to the final consideration of the single statement by Plaintiff's counsel in closing argument.

### **The Closing Argument**

Plaintiff's counsel later referred to the above testimony during closing arguments, telling the jury: "**She was angry when she found out that she was lied to. She believed them, that filters were going to keep her safe, that it was safer**." (Emphasis added.)

This was a single-sentence remark in a closing argument spanning 75 pages of transcript. And while it is in part a repetition of an inadmissible

68

hearsay statement, the mere fact that this cumulative evidence is repeated in closing argument does not automatically turn harmless error into harmful error. See Sutton, 909 So. 2d at 296 ("The defendant also argues that under DiGuilio, if evidence is erroneously admitted at a trial and if that evidence is argued to the jury, then there must be an automatic reversal. That is not an accurate interpretation of DiGuilio.") (citing Mendoza v. State, 700 So. 2d 670, 678 (Fla. 1997) (finding evidentiary error to be harmless under the circumstances of the case, even though argued to the jury)).

To the extent that the majority opinion focuses on Plaintiff's characterization of Philip Morris as having "lied," such characterization is not only accurate, it is an inescapable fact, given the *admissible* testimony by Jules, A.J. and Michael, as well as the preclusive findings applicable to a member of the Engle class (jury was instructed that they **must accept as true** that "Philip Morris concealed or omitted material information not otherwise known or available, knowing that the material was false and misleading, or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes or both"), and the accompanying testimony of plaintiff's expert Dr. Proctor, detailing the nature and scope of the tobacco industry's deceptive marketing campaign to mislead smokers to believe that cigarettes were not injurious to their health and that filtered

69

cigarettes would be cleaner and safer, while knowing that the opposite was true. In other words, the evidence and preclusive facts established that Philip Morris did in fact "lie" to smokers and the general public about the addictive, harmful and unsafe nature of their product. The admissible evidence also established that Norma read, heard and believed what Philip Morris and other tobacco companies were telling her, and continued smoking filtered cigarettes as a result. This evidence, and the argument made upon it, was admissible and relevant, not only to the issue of detrimental reliance, but plaintiff's entitlement to punitive damages as well.[16]

---

[16] Again, context is critical—it must be remembered that the jury was called upon to determine by its verdict whether Plaintiff had proven, by clear and convincing evidence, entitlement to punitive damages and, if so, in what amount. See R.J. Reynolds Tobacco Co. v. Schleider, 273 So. 3d 63, 68 (Fla. 3d DCA 2018) ("Arguments inappropriate in a simple negligence case may be appropriate concerning record evidence of a party's intentional misconduct in the context of a claim for punitive damages. To give an obvious example, it is generally reversible error in a simple tort case seeking compensatory damages to ask a jury to 'send a message' and punish or penalize the defendant. Here, however, the jury was instructed to consider whether R.J. Reynolds committed intentional misconduct, meaning 'Reynolds had actual knowledge of the wrong of the conduct and the high probability that injury would result and, despite that knowledge intentionally pursued that course of conduct,' in which event the jury was directed to consider the propriety of punitive damages 'as a punishment to Reynolds and as a deterrent to others.'") (internal citation omitted).

In the instant case, the trial court instructed that, in determining whether punitive damages were warranted, the jury was required to consider, inter alia, whether Philip Morris' conduct "was so gross and flagrant as to show a reckless disregard of human life or the safety of persons exposed to the

Further, Norma's "anger" upon discovering such a lie is not hearsay (when testified to by her family members who witnessed her angry demeanor, see, e.g., Bryant v. State, 17 So. 3d 713 (Fla. 4th DCA 2009); Shiver v. State, 564 So. 2d 1158 (Fla. 1st DCA 1990)), and was relevant to the jury's assessment of Plaintiff's claim that Norma did not know of the dangers and adverse health effects of smoking concealed from her by Philip Morris, and that she detrimentally relied on Philip Morris' advertising and marketing to continue smoking. As the trial court instructed the jury in its consideration of Plaintiff's claim of fraudulent concealment: "Mrs. Lipp cannot be found to have reasonably relied on a statement if she knew it was false or its falsity was obvious to her, or if the fact allegedly concealed was already known to her."

The majority's conclusion that the erroneous admission of this testimony, and reference to it in closing, somehow inflamed the passions of the jury or improperly misled the jury is further refuted by at least two aspects of the jury's verdict:

---

effects of such conduct. . . or showed such an entire lack of care that Philip Morris must have been consciously indifferent to the consequences. . . or must have wantonly or recklessly disregarded the safety and welfare of the public. . . ." Thus, the nature, scope and magnitude of Philip Morris' intentional and misleading misconduct (and the characterization of that conduct as a "lie" and Norma's anger upon discovery of same) were relevant for the jury's determination of entitlement to punitive damages.

71

In closing argument, Plaintiff asked the jury to return a verdict awarding compensatory damages of $7 million for each of the four surviving family members (husband Jules and children, A.J., Michael and Tracie), which would have totaled $28 million had the jury returned a verdict in the amount requested. However, the jury did not do so, instead cutting that amount nearly in half and returning a compensatory damage award of $3.75 million for each survivor, for a total of $15 million.[17]

_____

[17] The majority opinion posits that the "substantial punitive damages award" in this case undercuts any possibility that the error was harmless, see Maj. Op. at *15-16, citing to Philip Morris USA, Inc. v. Duignan, 370 So. 3d 978 (Fla. 2d DCA 2023). There are at least two facts that render Duignan inapt. In Duignan, the jury awarded punitive damages in an amount that exceeded what the plaintiff asked for. In the instant case, the jury awarded punitive damages in the amount requested by Plaintiff. More importantly, the jury's compensatory award was only 53% of the amount requested by Plaintiff: Plaintiff requested a total award of $28 million in compensatory damages; the jury awarded $15 million. This belies any notion that the jury's verdict was the result of improper influence or emotional appeal. See R.J. Reynolds Tobacco Co. v. Schleider, 273 So. 3d 63, 70-71 (Fla. 3d DCA 2018) (awarding compensatory damages in an amount less than requested was among the factors that "strongly indicate[d] the jury was not inflamed, prejudiced, or improperly mislead by closing arguments.").

Importantly, the jury was instructed by the court, before reaching this verdict, that the purpose of compensatory damages was to compensate the Lipps, not to punish Philip Morris, and that punitive damages served as both punishment to Philip Morris and a deterrent to others. If the hearsay testimony from Mrs. Lipp's sons truly swayed the sympathies of the jury improperly (as the majority opinion insists), why wouldn't the jury have awarded the Lipps the full amount of compensatory damages requested (or even more than the Lipps requested), rather than cutting that amount nearly in half? Indeed, as the purpose of punitive damages was to punish Philip

72

In addition, Plaintiff's counsel suggested that the jury should apportion no comparative fault to Norma, but acknowledged that if the jury decided some fault was to be apportioned to her, it should apportion only 10%. Instead, the jury apportioned comparative fault of 15% to her and 85% to Philip Morris.

These aspects of the jury's verdict reflect a thoughtful, proper and dispassionate consideration of the evidence, not the emotional one suggested by the majority opinion. This is properly considered by a reviewing court in assessing whether the error contributed to the jury's verdict. See R.J. Reynolds Tobacco Co. v. Schleider, 273 So. 3d 63, 71 (Fla. 3d DCA 2018) (affirming jury's verdict, noting that the jury "awarded less than the compensatory amount requested for the daughter; and attributed a higher percentage of comparative negligence to Mr. Schleider than what Plaintiffs' counsel argued for in closing. These actions by the jury strongly indicate the jury was not inflamed, prejudiced, or improperly mislead by closing arguments.").

---

Morris for its fraud, not to compensate the Lipps for the damages they suffered, any ostensibly improper sympathy engendered by the hearsay testimony would have been reflected in the compensatory damages award. It was not.

73

As the Florida Supreme Court has explicitly recognized, the harmless error test "foster[s] consistency in appellate courts' analyses of harmless error." Special, 160 So. 3d at 1257. The guiding principles of harmless error jurisprudence in this country make clear that "evidence admitted improperly will not justify reversal where other competent evidence exists to prove the case and where the improper evidence was merely part of this cumulative evidence." 23 Fla. Jur 2d Evidence and Witnesses §147 (June 2025 update). Importantly, "the focus is on the effect the error may have had on the trier of fact." Bugg v. State, 295 So. 3d 1238, 1245 (Fla. 5th DCA 2020) (citing DiGuilio, 491 So. 2d at 1139). "But relief is not warranted if there is 'no reasonable probability that the cumulative effect of these errors affected [a defendant's] right to a fair trial.'" Smith v. State, 320 So. 3d 20, 33 (Fla. 2021) (quoting Floyd, 850 So. 2d at 408).

If the majority opinion stands, it will be nearly impossible for this court to find harmless error in cases (both civil and criminal) where the evidence erroneously admitted by the trial court was cumulative to the other evidence properly presented to the jury.

The majority opinion conflicts with innumerable decisions of the Florida Supreme Court, this court, and our sister district courts of appeal. As a representative sample, but far from an exhaustive list, see Sexton v. State,

74

221 So. 3d 547, 556 (Fla. 2017) (defendant asserted the trial court erred in allowing inadmissible hearsay testimony from a police officer that defendant's wife told police he was lying about the time he got home the night of the murder. The Florida Supreme Court held defendant was not entitled to relief on this claim because, even if trial court erred in admitting the wife's statement to police, she testified at trial that he got home later than he said on the night of the murder. **"Because admission of the same statement through Detective Grady was merely cumulative to Catherine's trial testimony, we conclude that there is no reasonable possibility that the admission of Catherine's out-of-court statement affected the verdict,"** and thus, "was harmless beyond a reasonable doubt."); Pla v. Rierson, 406 So. 3d 1027, 1033 (Fla. 3d DCA 2025) (appeal from judgment following trial in a negligence action filed by a pedestrian against the driver of a car who hit the pedestrian. Defendant contended she was entitled to a new trial because trial court allowed plaintiff's counsel to impeach defendant regarding prior inconsistent statements about the speed she was driving at, but sustained objections from plaintiff's counsel when defense counsel attempted to rehabilitate defendant with prior consistent statements on redirect. We held any error in excluding this testimony was harmless, given that the driver "and other witnesses testified extensively

75

about the inconsistencies between [defendant's] trial testimony and her deposition testimony, and the experts had already accounted for variations in [defendant's] possible speed. . . ."); Carnright v. State, 388 So. 3d 926, 928-929 (Fla. 3d DCA 2024) (in sexual battery case, where defense was consent, trial court's erroneous exclusion of text messages sent by the victim to her friends indicating that she "did coke all night with this guy" (meaning defendant), that she "appears to boast about receiving money from him, and suggests that she would perform oral sex for money and had done so before" was held harmless where the "jury sufficiently received the information" when the trial court allowed such messages to be summarized for impeachment or refreshing the victim's recollection); Rolle v. State, 215 So. 3d 75, 80 (Fla. 3d DCA 2016) (defendant convicted of, inter alia, two counts of attempted murder. Trial court allowed detective to testify, over hearsay objection, that he interviewed one of the victims at the hospital, who told detective he saw a white car with damage to it (defendant drove a car matching that description) drive by just before the shooting, the car went into an alley, and shortly thereafter a black male dressed in dark clothing walked in front of the [victims'] car and started shooting. The trial court also permitted detective to testify (again over hearsay objection) that he interviewed the second victim who said "essentially the same thing, . . . that a vehicle passed by there. It

76

was a Black male dressed in dark clothing produced an AK-47 began to shoot at them while they were in the car." This court held that the first victim's testimony was admissible as an excited utterance, and the second victim's testimony, while hearsay and erroneously admitted, was harmless beyond a reasonable doubt because it was merely cumulative to the properly admitted testimony of the first victim); Golden & Cowan, P.A. v. Estate of Kosofsky, 45 So. 3d 986, 987 (Fla. 3d DCA 2010) (trial court erroneously allowed telephonic testimony at trial because petitioner objected but the error was harmless "due to the existence of other independent evidence which would have led the trial court to reach the same conclusion."); Lee v. State, 869 So. 2d 1251 (Fla. 3d DCA 2004) (in a felony petit theft case arising from defendant's theft of six cameras from a Walgreen's store, testimony by police officer that security guard told him that he observed defendant pick up the cameras and put them in his bag before exiting the store without paying, was hearsay and erroneously admitted; however, the error was harmless because the security guard testified to the same facts at trial, the bag of cameras was recovered at the scene and observed by the officer, and other witnesses testified that defendant's departure from the store set off checkpoint alarms); Wallace v. State, 766 So. 2d 364 (Fla. 3d DCA 2000) (defendant was charged with murder and attempted murder following a bar

shooting, and raised the defense of insanity. On appeal, he asserted the trial court erroneously excluded his testimony that others had told him the people working at the bar were Satanists and connected with the Mafia. This court held that the exclusion of this testimony was erroneous because the testimony was non-hearsay, offered to prove defendant's state of mind, but further held that the error was harmless because it was cumulative of other evidence presented to the jury, namely, witnesses who testified that defendant told them, prior to the shooting, that the people at the bar were evil, Satanists, or part of the Mafia); Clausell, 548 So. 2d at 891 ("It is well settled that even incorrectly admitted evidence is deemed harmless and may not cause reversal when it is essentially the same as or merely corroborative of other properly considered testimony."); see also Jakubowski v. State, 286 So. 3d 955 (Fla. 1st DCA 2019) (Allowing nurse to read the contents of her report of the victim's statements was error because they were hearsay and did not qualify as statements made for medical diagnosis or treatment; however, error was deemed harmless and cumulative where the victim testified to the same information.); Gilbert v. State, 324 So. 3d 598, 603 (Fla. 2d DCA 2021) (admission of victim's journal was error because it did not qualify as a prior consistent statement; however the error was deemed harmless, despite the fact that the victim's credibility was a central issue,

because, inter alia, "the trial court had already admitted the video interview with a Child Protection Team officer—which tracked the victim's statements in the journal almost exactly." The admission of the journal was harmless error, "because the jury was going to hear these statements anyway."); McGrady v. State, 395 So. 3d 539, 542 (Fla. 4th DCA 2024) (defendant convicted of committing an unnatural and lascivious act, battery, and lewd or lascivious molestation of a child victim. On appeal, defendant asserted the trial court erred by performing its gatekeeping function as to the child victim's competency in front of the jury. Held: "Conducting the competency determination in the presence of the jury was not error, but even if it was determined to be error, at most it was harmless error because the victim's answers were cumulative to statements she made in the CPT interview, which was admitted into evidence."); Cannon v. State, 315 So. 3d 732 (Fla. 4th DCA 2021) (holding that, although it was error for trial court to allow the police officer to testify about the contents of the BOLO he received and the defendant's driving record from the NCIC database, the error was harmless beyond a reasonable doubt because it was cumulative to the victim's description of the incident and the same officer's unobjected-to testimony that he cited the defendant for driving with a revoked license.); Bugg, 295 So. 3d at 1243 (trial court erred in overruling defense counsel's hearsay

79

objection when detective testified that a witness to the crime gave detective a physical description of the perpetrator as "a light-skinned, black male, about five-eight to five-nine, about 180-185 pounds, I believe with black frame glasses and a bald head." He was questioned about a second witness' description and, again over a hearsay objection, provided similar testimony. The district court held this testimony was inadmissible hearsay and it was error to overrule the defense objections; however, the error was harmless because the victim and another witness had already testified to picking defendant out of a lineup and identifying defendant at trial as the perpetrator); English v. State, 43 So. 3d 871 (Fla. 5th DCA 2010) (holding it was error to allow sheriff to testify about the description of the suspect broadcast in a BOLO, but error was harmless where the victim testified to the same description at trial, rendering the erroneously admitted testimony cumulative.).

## **CONCLUSION**

In sum, the application of the harmless error test to the instant case leads inescapably to one conclusion: considered in context and together with the other admissible evidence and the disputed issues at trial, there is no reasonable possibility that the meager hearsay testimony relied upon by the majority opinion contributed to the verdict in this case, and the error was

harmless beyond a reasonable doubt.  <u>Special</u>, 160 So. 3d at 1254-55 ("The purpose of the harmless error analysis is to 'conserve judicial labor by holding harmless those errors which, in the context of a case, do not vitiate the right to a fair trial and, thus, do not require a new trial'") (quoting <u>DiGuilio</u>, 491 So. 2d at 1135); <u>Torres-Arboledo v. State</u>, 524 So. 2d 403, 408 (Fla. 1988) (holding that where improperly admitted hearsay testimony is merely cumulative to other properly admitted testimony, the admission of the hearsay testimony was harmless beyond a reasonable doubt and did not warrant a new trial); <u>Floyd v. State</u>, 850 So. 2d 383 (Fla. 2002) (same); <u>Garlobo v. State</u>, 404 So. 3d 541 (Fla. 3d DCA 2025) (where hearsay statements of witnesses were merely cumulative of the testimony of witnesses properly admitted at trial, their admission was harmless); <u>Casica v. State</u>, 24 So. 3d 1236 (Fla. 4th DCA 2009) (same); <u>Miles v. State</u>, 839 So. 2d 814 (Fla. 4th DCA 2003) (same).[18]

---

[18] Though not contained in the majority's analysis, to the extent that counsel's reiteration in closing that "they lied to me" might somehow be viewed as independently improper, it must be remembered that the jury was called upon to determine by its verdict whether Plaintiff had proven, by clear and convincing evidence, entitlement to punitive damages and, if so, in what amount.  <u>See</u> <u>R.J. Reynolds Tobacco Co. v. Schleider</u>, 273 So. 3d 63, 68 (Fla. 3d DCA 2018) ("Arguments inappropriate in a simple negligence case may be appropriate concerning record evidence of a party's intentional misconduct in the context of a claim for punitive damages. To give an obvious example, it is generally reversible error in a simple tort case seeking compensatory damages to ask a jury to 'send a message' and punish or

Accordingly, I believe this court must affirm and I respectfully dissent from the majority opinion's reversal and remand for a new trial.

---

penalize the defendant. <u>See, e.g.</u>, <u>Erie Ins. Co. v. Bushy</u>, 394 So.2d 228, 229 (Fla. 5th DCA 1981). Here, however, the jury was instructed to consider whether R.J. Reynolds committed intentional misconduct, meaning 'Reynolds had actual knowledge of the wrong of the conduct and the high probability that injury would result and, despite that knowledge intentionally pursued that course of conduct,' in which event the jury was directed to consider the propriety of punitive damages 'as a punishment to Reynolds and as a deterrent to others.'").